UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of the United States of America for Authorization to Intercept Wire Communications Occurring over the Cellular Telephone Initially Identified as 917-670-2504, USAO Reference No. 2014R01194. | **Application for Order Authorizing the Interception of Wire Communications over a Cellular Telephone**<br><br>**Sealed** |

## Contents

I. Specifications ............................................................................................................... 2

  A. Scope of Application.................................................................................................. 2

  B. DOJ Authorization .................................................................................................... 3

  C. Supporting Affidavit ................................................................................................. 4

  D. Target Subjects........................................................................................................ 4

  E. Target Offenses ....................................................................................................... 4

  F. Objectives of the Interception ................................................................................. 5

  G. Target Cellphone and Service Provider. ................................................................. 5

    1. Target Cellphone and Successor Target Cellphone ........................................... 5

    2. Successor Service Provider .................................................................................. 6

  H. Communications Features of Target Cellphone...................................................... 6

    1. Wire Communications Capabilities ..................................................................... 6

  I. Background Conversations ....................................................................................... 6

  J. Territorial Scope and Jurisdiction ........................................................................... 7

  K. Period of Interception.............................................................................................. 7

  L. Monitoring, Personnel and Minimization................................................................. 7

  M. Prior Applications.................................................................................................... 8

II. Probable Cause and Normal Investigative Techniques............................................. 8

  A. Probable Cause....................................................................................................... 8

    1. Commission of Target Offenses ......................................................................... 8

    2. Use of Target Cellphone .................................................................................... 8

    3. Objectives of the Interception ............................................................................ 9

    4. Insufficiency of Alternative Investigative Techniques ........................................ 9

III. Orders Requested ........................................................................................................... 9

    A. Request for Order of Interception ................................................................................ 9

        1. Period of Interception ............................................................................................ 9

        2. Scope ..................................................................................................................... 10

        3. Monitoring and Minimization ............................................................................... 10

        4. Periodic Reports ................................................................................................... 10

        5. Inventory ............................................................................................................... 10

    B. Request for Order to Service Provider ......................................................................... 11

        1. Technical Assistance to Accomplish the Interception .......................................... 11

        2. Pen Register and Trap and Trace Information ...................................................... 11

        3. Geolocation Information and Delayed Notice and Return .................................... 12

        4. Non-Disclosure .................................................................................................... 13

        5. Successor Service Provider ................................................................................... 13

    C. Request for Order for Expedited Provision of Information Concerning Communications
Devices Related to the Interception ................................................................................... 14

    IV. Sealing ....................................................................................................................... 14

| State of New York | ) |
|---|---|
| Kings County | ) ss.: |
| Eastern District of New York | ) |

Hagan Scotten, an Assistant United States Attorney in the Southern District of New York, being duly sworn, states:

## I. Specifications
### A. Scope of Application

I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7) - that is, an attorney authorized by law to prosecute or participate in the prosecution of offenses enumerated in 18 U.S.C. § 2516. I respectfully submit this Application pursuant to the provisions of Chapter 119 of Title 18, United States Code ("Title III"), for an Order of

Interception authorizing the interception and recording of wire communications by the Target Subjects specified below over the Target Cellphone specified below. By this application I further request the Court to issue ancillary orders and warrants (a) to the Service Provider, and any Successor Service Provider, for (i) necessary technical support to accomplish the interception, pursuant to 18 U.S.C. § 2518(4); (ii) pen register and trap and trace information for the Target Cellphone, pursuant to 18 U.S.C. §§ 3121 *et seq.*; and (iii) cell site and other geolocation information for the Target Cellphone, pursuant to Fed. R. Crim. P. 41, with delayed notification to the person affected pursuant to Rule 41(f)(3) & 18 U.S.C. § 3103a(b); and (b) to any wire and electronic communications service provider, pursuant to 18 U.S.C. § 2703(d), for expedited provision of subscriber, toll and service records for telephones and communications devices in communication with the Target Cellphone.

**B.  DOJ Authorization**

Pursuant to the authority vested in her by Section 2516 of Title 18 of the United States Code, by Order Number 3536-2015 of June 11, 2015, the Attorney General of the United States has specially designated appropriate officials of the Criminal Division to exercise the power conferred on her by Section 2516 of Title 18 of the United States Code to authorize applications for a court order authorizing the interception of wire communications. Under the power delegated by special designation of the Attorney General, an appropriately designated official in the Criminal Division has authorized this application. A copy of that official's memorandum authorizing this application, ~~as well as a copy of the Attorney General's Order designating that official~~, are attached to this application as Exhibit A.

2013.07.17                                                    3

### C.  Supporting Affidavit

This Application is based on and incorporates by reference the September 2, 2015 Affidavit in Support of Application for Order Authorizing the Interception of Wire Communications over a Cellular Telephone ("the Affidavit") submitted by Special Agent Beth A. Lamanna of the Federal Bureau of Investigation (the "Investigating Agency") submitted in support of this Application.

### D.  Target Subjects

The Target Subjects whose communications are sought to be intercepted are: JOSEPH DATELLO, a/k/a "Big Joe," a/k/a "Joey Glasses;" CARLOS GOMEZ, a/k/a "Go Go;" FRANK SCARPATI; DOMINIC "Dom" TRUSCELLO; RICHARD "Richie" O'CONNOR; LOUIS "Louie" BORELLI; and others unknown.

### E.  Target Offenses

The Target Offenses that are the subject of this Application, each of which is a predicate offense under 18 U.S.C. § 2516, are: offenses involving the distribution, and possession with intent to distribute, of controlled substances, to wit, cocaine and heroin, the use of wire facilities to facilitate the same, the maintenance of drug-involved premises, conspiracy to do the same and attempts to do the same, in violation of 21 U.S.C. §§ 841, 843(b), 846, 848, and 856, and Title 46, United States Code, Section 70503; and racketeering and racketeering conspiracy (Racketeer Influenced and Corrupt Organizations "RICO"), in violation of 18 U.S.C. §§ 1962(c) and (d), and punishable under 18 U.S.C. § 1963, by conducting the affairs of an "enterprise," that is, a group of individuals associated in fact, although not a legal entity, to wit: the Target Subjects and others, the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity consisting of the violations of Title 21, United States Code, Sections 841,

2013.07.17                                        4

843, 846, 848, and 856 (drug trafficking); and Title 46, United States Code, Section 70503, collectively, the "Target Offenses."

**F.   Objectives of the Interception**
The objectives of the interception sought herein are to reveal to the greatest extent possible: (i) the nature, extent and methods of the Target Subjects' commission of the Target Offenses; (ii) the identities of the Target Subjects, to the extent currently unknown, as well as their accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (iii) the source, receipt, and distribution of contraband and money involved in the commission of the Target Offenses; (iv) the locations and items used in furtherance of those activities; (v) the existence and locations of records; (vi) the locations and sources of resources used to finance the illegal activities;(vii) the locations and disposition of the proceeds from and relating to those activities; and (viii) the location and other information necessary to seize and/or forfeit contraband, money and items of value, and other evidence of or proceeds of the commission of the Target Offenses. In addition, the intercepted communications are expected to constitute admissible evidence of the commission of the Target Offenses.

**G.   Target Cellphone and Service Provider.**
**1.   Target Cellphone and Successor Target Cellphone**
This Application applies to communications occurring over the cellphone ("Target Cellphone") currently assigned telephone number 917-670-2504. The Target Cellphone is subscribed to in the name of "Lorenzo Gallo, The Safety Group, Ltd., 11 Hannover Sq Ste 15 Fl Wall Street New York 10005-2818." The current Service Provider for the Target Cellphone is Verizon. The current International Mobile Equipment Identifier ("IMEI") for the Target Cellphone is 9900042008143000. This Application also applies not only to the Target Cellphone

as identified above, but also to any other telephone number subsequently assigned to or used by a cellphone bearing the same IMEI, or any cellphone with a different IMEI but bearing the same telephone number as above ("Successor Target Cellphone"), within the Period of Interception. At this time, the key identifier for the Target Cellphone, and the means by which it will be identified to the Service Provider for installation of the intercept, is the telephone number.

### 2. Successor Service Provider

As explained in the Affidavit, because cellphone users can change service providers, this Application also applies to any subsequent service provider who may provide service to the Target Cellphone ("Successor Service Provider"). As discussed above, it is requested that the Order of Interception apply without further order of this Court to any Successor Target Cellphones, as well as to any Successor Service Provider for the Target Cellphone. Further, unless otherwise indicated, references herein to the "Target Cellphone" or "Service Provider" include any successors thereto.

### H. Communications Features of Target Cellphone
### 1. Wire Communications Capabilities

In addition to normal voice communications capabilities, the Service Provider for the Target Cellphone has advised us that the Target Cellphone has voicemail capabilities. It is requested that the Order of Interception also apply to messages left to, and retrieved from, voicemail, that are otherwise subject to interception under Title III.

### I. Background Conversations

As explained in the Affidavit, it is requested that the Order of Interception also apply to relevant background conversations which are likely to be overheard over the Target Cellphone

while the Target Cellphone is active or otherwise in use, that are otherwise subject to interception under Title III.

**J.   Territorial Scope and Jurisdiction**

With the technical assistance of the service provider for the Target Cellphone, all communications intercepted over the Target Cellphone will have been routed through and first intercepted in the Eastern District of New York. *See United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1992) ("the interception must also be considered to occur at the place where the redirected contents are first heard").

**K.   Period of Interception**

The Investigating Agency will execute the Order of Interception as soon as practicable after it is signed. Inasmuch as the illegal operation described herein is a continuing conspiracy involving numerous persons as yet unidentified and unknown, it is requested that authorization to intercept not automatically terminate when the first communication described herein has been obtained, but rather continue until the Objectives of the Interception are fully achieved, or for a period of thirty (30) days, whichever is earlier. The thirty days is measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under the Order of Interception, or ten days from the date of that Order.

**L.   Monitoring, Personnel and Minimization**

As set forth in the Affidavit, all monitoring will be conducted by personnel authorized to do so under 18 U.S.C. § 2518(5), and in such a way as to minimize the interception of communications not otherwise subject to interception under Title III. To this end, written Minimization Instructions will be provided by me or another Assistant United States Attorney supervising this interception to the monitoring agents and personnel.

### M. Prior Applications

I have been informed that reviews have been done of the wire and electronic surveillance files of the Drug Enforcement Administration, the Federal Bureau of Investigation, and the United States Immigration and Customs Enforcement. Based on these reviews, I have been informed that there have been no prior applications for court authorization to intercept, or approval of interception of, wire, oral, or electronic communications of the Target Subjects or over the Target Cellphone, except as may be set forth in the Affidavit.

## II. Probable Cause and Normal Investigative Techniques

### A. Probable Cause

I have discussed the circumstances of the above investigation with Special Agent Lamanna of the Investigating Agency, who is assigned at present to the New York Field Division of the FBI, and who has participated in the investigation herein. I have also examined Special Agent Lamanna's Affidavit submitted in support of this Application. I respectfully submit that the Affidavit establishes:

### 1. Commission of Target Offenses

There is probable cause to believe that one or more of the Target Subjects has committed, is committing, and will continue to commit one or more of the Target Offenses during at least the Period of Interception sought herein.

### 2. Use of Target Cellphone

There is probable cause to believe that one or more of the Target Subjects will use the Target Cellphone within the Eastern District of New York and/or elsewhere within the United States, in furtherance of, in connection with, to facilitate, to accomplish, and to commit one or more of the Target Offenses, and that such communications will occur on a continuing basis during the Period of Interception requested herein.

2013.07.17                                        8

### 3. Objectives of the Interception

There is probable cause to believe that the interception for which authorization is now sought will help to achieve the Objectives of the Interception specified above.

### 4. Insufficiency of Alternative Investigative Techniques

As set forth more fully in the Affidavit, normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried or to be too dangerous.

## III. Orders Requested

### A. Request for Order of Interception

On the basis of the allegations contained in this Application and the Affidavit, it is hereby requested that this Court issue an Order of Interception in the form attached containing the substance of the following provisions:

### 1. Period of Interception

Pursuant to 18 U.S.C. §§ 2518(4)(e) & (5), authorizing special agents of the Investigating Agency and other investigative and law enforcement officers, assisted, if necessary, by authorized translators, to intercept and to record wire communications of the Target Subjects over the Target Cellphone, with execution of the Order of Interception to commence as soon as practicable after the Order of Interception is signed and to not automatically terminate when the first communication described herein has been obtained, but rather to continue until the Objectives of the Interception are fully achieved, or for a period of thirty (30) days, whichever is earliest. The thirty days is measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under the Order of Interception, or ten days from the date of that Order.

**2. Scope**

Pursuant to 18 U.S.C. § 2518(3), authorizing the interception of wire communications that are subject to interception under Title III occurring both within the Eastern District of New York; authorizing the interception of messages that are subject to interception under Title III left to or retrieved from voicemail for the Target Cellphone; authorizing the interception of relevant background conversations that are subject to interception under Title III occurring in the vicinity of the Target Cellphone while the telephone is active or otherwise in use, with all intercepted communications to be routed through and first intercepted in the Eastern District of New York.

**3. Monitoring and Minimization**

Pursuant to 18 U.S.C. § 2518(5), authorizing monitoring and minimization of intercepted communications to be conducted as detailed in the accompanying affidavit.

**4. Periodic Reports**

Pursuant to 18 U.S.C. § 2518(6), that the Government shall provide to the Court a report on or about the tenth and twentieth days (as computed pursuant to Fed. R. Crim. P. 45) following the date of the Order or the date interception begins, whichever is later, showing what progress has been made toward the achievement of the Objectives of the Interception and the need for continued interception.

**5. Inventory**

Pursuant to 18 U.S.C. § 2518(8)(d), that no inventory of the results of the interception for which authorization is now sought need be made before 90 days from the date of the expiration of the Order of Interception or any extension thereof, or at such later time as this Court or another judge of competent jurisdiction, upon further application and for good cause shown, may order.

2013.07.17                                          10

### B.  Request for Order to Service Provider

On the basis of the allegations contained in this Application and the Affidavit submitted in support thereof, it is hereby requested that this Court include within the Order of Interception and the Order to Service Provider the substance of the following provisions:

### 1.  Technical Assistance to Accomplish the Interception

Pursuant to 18 U.S.C. § 2518(4), that the Service Provider for the Target Cellphone, and any Successor Service Provider for the Target Cellphone, furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with services to the persons whose communications are to be intercepted, and maintain service to the Target Cellphone for the period of interception and any extensions thereto. This assistance is required to accomplish the Objectives of the Interception. Reasonable expenses incurred pursuant to this activity will be processed for payment by the Investigating Agency.

### 2.  Pen Register and Trap and Trace Information

Pursuant to 18 U.S.C. §§ 3121 *et seq.*, that the Investigating Agency may request, and the Service Provider and any Successor Service Provider for the Target Cellphone shall provide, for 30 days, or until the end of the Period of Interception set forth above, whichever is later, installation and use of a pen register and trap and trace device on the Target Cellphone, to record and decode dialing, routing, addressing, or signaling information transmitted by the Target Cellphone, and to capture the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication to the Target Cellphone, including all communication-forwarding information, and the date, time and duration of such communications. It is further requested that any service provider to whom this order applies be

2013.07.17                                        11

directed not to provide notice of the order to any other person unless or until otherwise ordered by the Court. Pursuant to 18 U.S.C. § 3122(b)(2), I hereby certify that the information likely to be obtained by installation and use of a pen register and trap and trace device is relevant to this ongoing criminal investigation.

### 3. Geolocation Information and Delayed Notice and Return

Pursuant to Rule 41 of the Federal Rules of Criminal Procedure, that the Investigating Agency may request, and the Service Provider and any Successor Service Provider for the Target Cellphone shall provide, during the Period of Interception set forth above, all information, facilities and technical assistance needed to ascertain the physical location of the Target Cellphone, including but not limited to data indicating the specific latitude and longitude of, or other precise location information concerning, the Target Cellphone. Such information shall, where other information is unavailable, include records reflecting the tower and antenna face ("cell site") used by the Target Cellphone at the start and end of any call. (Absent a warrant, cell-site data is also available under the pen register provisions of 18 U.S.C. §§ 3121-3126 and the records provisions of 18 U.S.C. §2703(d), with which this application complies *a fortiori*.) The technical assistance needed includes initiating a signal to determine the location of the Target Cellphone on the service provider's network or in relation to such other reference points as may be reasonably available, at such intervals and times as directed by the Investigating Agency, unobtrusively and with a minimum of interference to service to the Target Cellphone, and at any time of day or night, owing to the potential need to locate the Target Cellphone outside of daytime hours. As explained in further detail in the Affidavit, there is probable cause to believe that the location of the Target Cellphone will constitute or lead to evidence of the Target

2013.07.17

Offenses. Pursuant to 18 U.S.C. § 3103a(b) and Rule 41(f)(3) of the Federal Rules of Criminal Procedure, it is further requested that, because earlier notice may seriously jeopardize the investigation, endanger the life or physical safety of investigating agents or other persons, lead to flight of suspects, loss of evidence, and/or intimidation of witnesses, the Court authorize delay of notice of the acquisition of the geolocation information until 30 days after execution of the warrant (including extensions or renewals) for geolocation information has commenced, or the date when collection under the warrant (including extensions or renewals) has ended, whichever is later. It is also requested that the return on the warrant for geolocation information under Rule 41(f) be made at the time of, and as part of, the sealing of the information obtained pursuant to the Order of Interception, including any extensions.

### 4. Non-Disclosure

That the Service Provider and any Successor Service Provider and their respective agents and employees not disclose or cause the disclosure of the Order to Service Provider to any person other than those of their agents and employees who require said information to accomplish the interception ordered, and that, in particular, the Service Provider and any Successor Service Provider and their respective agents and employees shall in no event make such disclosure to the telephone user involved, or to any actual or potential interceptee.

### 5. Successor Service Provider

That in the event that the service provider for the Target Cellphone changes during the course of the interception, the Order to Service Provider shall, upon service of the Order, apply to any Successor Service Provider without further order of this court; and that the Service Provider and any Successor Service Provider inform the Investigating Agency immediately if the

service provider changes during the course of the Interception Period, or if the IMEI or telephone numbers for the Target Cellphone are supplied to another service provider.

### C. Request for Order for Expedited Provision of Information Concerning Communications Devices Related to the Interception

Pursuant to 18 U.S.C. § 2703(d), to expedite achievement of the Objectives of the Interception, it is hereby requested that the Court enter an order directing that any electronic or wire communications service provider that provides service to a telephone or other device in communication with the Target Cellphone provide to the Investigating Agency, within 24 hours of service of request by the Investigating Agency, all published and non-published subscriber information, including telephone or instrument number or other subscriber number or identity and any temporarily assigned network address; means and source of payment for such service (including any credit card or bank account number); and local and long distance call and call duration records for up to a 30-day period immediately preceding the Investigating Agency's request. The Application and Affidavit set forth specific and articulable facts showing reasonable grounds to believe that the information sought is relevant and material to this ongoing criminal investigation. Pursuant to 18 U.S.C. § 2705(b), it is further requested that for the reasons set forth above, the order include a direction that such service provider not provide notice to the subscriber or customer as to whom information is provided until such time as the inventory required under 18 U.S.C. § 2518(8)(d) is served.

### IV. Sealing

It is further requested that to avoid premature disclosure of the investigation, guard against flight of suspects or the loss of evidence, and to better ensure the safety of agents and others, this Application, including the Affidavit and accompanying proposed orders, as well as

any Periodic Reports, be sealed and filed with the clerk for the Eastern District of New York

until ordered unsealed by the Court or by another judge of competent jurisdiction, except that

copies of the Order of Interception, Order to Service Provider, and ancillary orders requested

herein may be provided to the Investigating Agency and to the Government, and be served on

service providers as may be necessary to effect the order's purpose.

Hagan Scotten
Assistant United States Attorney
Southern District of New York
(914) 993-1924

Sworn to before me this

4th day of September, 2015

THE HONORABLE MARGO K. BRODIE
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

2013.07.17                                         15



**U.S. Department of Justice**

Criminal Division

Washington, D.C.  20530

SEP 0 2 2015

## MEMORANDUM

TO:         Monique Perez Roth, Director
            Office of Enforcement Operations
            Criminal Division

ATTN:       Hagan Scotten

FROM:       Leslie R. Caldwell
            Assistant Attorney General
            Criminal Division

SUBJECT:    Authorization for Interception Order Application

This is with regard to your recommendation that an appropriately designated official of the Criminal Division authorize an application to a federal judge of competent jurisdiction for an order under Title 18, United States Code, Section 2518, authorizing for a thirty (30) day period the initial interception of wire communications occurring to and from the cellular telephone bearing the number (917) 670-2504, subscribed to by Lorenzo Gallo, The Safety Group, Ltd., 11 Hannover Sq Ste 15 Fl Wall Street New York, in connection with an investigation into possible violations of Title 21, United States Code, Sections 841, 843, 846, 848, and 856, and Title 46, United States Code, Section 70503, and Title 18, United States Code, Sections 1962 and 1963, by Joseph Datello, Carlos Gomez, Frank Scarpati, Dominic Truscello, Richard O'Connor, Louis Borelli, and others as yet unknown.

By virtue of the authority vested in the Attorney General of the United States by Section 2516 of Title 18, United States Code, the Attorney General has by Order Number 3536-2015, dated June 11, 2015, designated specific officials in the Criminal Division to authorize applications for court orders authorizing the interception of wire or oral communications.  As a duly designated official in the Criminal Division, this power is

exercisable by the undersigned.   WHEREFORE, acting under this
delegated power, the appropriately designated official
authorizes the above-described application to be made by any
investigative or law enforcement officer of the United States as
defined in Section 2510(7) of Title 18, United States Code.

The authorization given is intended to apply not only to
the target telephone number listed above, but also to any other
telephone number subsequently assigned to or used by the
instrument bearing the same international mobile equipment
identification number used by the target telephone, within the
thirty-day period.   The authorization is also intended to apply
to the target telephone number referenced above regardless of
service provider, and to background conversations intercepted in
the vicinity of the target telephone while the telephone is off
the hook or otherwise in use.


Leslie R. Caldwell
Assistant Attorney General
Criminal Division


SEP 0 2 2015

Date


PAUL O'BRIEN
DEPUTY ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of the United States of America for Authorization to Intercept Wire Communications Occurring over the Cellular Telephone Initially Identified as 917-670-2504, USAO Reference No. 2014R01194. | **Affidavit in Support of Application for Order Authorizing the Interception of Wire Communications over a Cellular Telephone**<br><br>**Sealed** |

# Contents

I. Specifications ................................................................................................................ 3

   A. Affiant ................................................................................................................... 3

   B. Purpose of Affidavit ............................................................................................. 3

   C. Target Subjects. .................................................................................................... 4

   D. Target Offenses .................................................................................................... 4

   E. Objectives of the Interception............................................................................... 5

   F. Target Cellphone and Service Provider ................................................................. 6

      1. Target Cellphone and Successor Target Cellphone Identifiers – General ..................... 6

      2. Successor Service Provider................................................................................. 6

      3. Target Cellphone ................................................................................................. 7

      4. Application to Successor Target Cellphone and Successor Service Provider. ................. 7

   G. Communications Features of Target Cellphone..................................................... 7

      1. Wire Communications Capabilities ..................................................................... 7

   H. Background Conversations .................................................................................... 8

   I. Territorial Scope and Jurisdiction.......................................................................... 8

   J. Period of Interception ........................................................................................... 8

   K. Monitoring Agents and Personnel......................................................................... 9

   L. Minimization of Wire Communications................................................................. 9

   M. Prior Applications................................................................................................ 10

II. The Investigation and Probable Cause ....................................................................... 12

   A. Probable Cause..................................................................................................... 12

   B. Basis and Scope of Declarations .......................................................................... 12

C. Details of the Investigation ................................................................................... 13

  1. Background to the Investigation .......................................................................... 13

D. Analysis of Communications Records for Target Cellphone ............................... 32

III. Normal Investigative Techniques ........................................................................... 33

A. Insufficiency of Alternative Investigative Techniques ........................................ 33

  1. Undercover Officers............................................................................................. 34

  2. Confidential Informants and Cooperating Witnesses ......................................... 35

  3. Physical Surveillance .......................................................................................... 37

  4. Pole Camera........................................................................................................ 38

  5. Geolocation Information ..................................................................................... 39

  6. Telephone Records and Pen Registers ................................................................ 39

  7. Results of Prior Title III Interceptions .............................................................. 40

  8. Grand Jury Process ............................................................................................. 42

  9. Search Warrants ................................................................................................. 42

  10. Arrests ............................................................................................................... 43

  11. Witness Interviews ............................................................................................ 44

  12. Trash Searches .................................................................................................. 44

  13. Parallel and Related Investigations.................................................................. 44

IV. Ancillary Investigative Orders................................................................................ 45

A. Order to Service Provider .................................................................................... 45

  1. Technical Assistance to Accomplish the Interception ........................................ 45

  2. Pen Register and Trap and Trace Information.................................................... 45

  3. Geolocation Information and Delayed Notice and Return .................................. 46

  4. Non-Disclosure ................................................................................................... 48

  5. Successor Service Provider................................................................................. 48

B. Order for Expedited Provision of Information Concerning Communications Devices Related to the Interception ...................................................................................... 48

V. Sealing......................................................................................................................... 49

2013.07.17

2

State of New York       )
Kings County           ) ss.:
Eastern District of New York   )

Beth A. Lamanna, a Special Agent with the Federal Bureau of Investigation (the "FBI"), being duly sworn, deposes and states:

# I. Specifications
## A. Affiant

I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7)—that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I have been a special agent of the FBI for approximately nineteen years. During that time, I have participated in investigations of unlawful drug trafficking and organized crime groups, including La Cosa Nostra ("LCN") and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and have participated in investigations that included the interception of wire communications. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the "lingo" and coded language used by narcotics traffickers. I have also become familiar with the methods of operation, structures, norms, and "lingo" used by LCN groups.

## B. Purpose of Affidavit

I respectfully submit this Affidavit in support of the Application of Assistant United States Attorney Hagan Scotten pursuant to the provisions of Chapter 119 of Title 18, United

States Code ("Title III"), for an Order of Interception authorizing the interception and recording of wire communications by the Target Subjects specified below over the Target Cellphone specified below. I further submit this Affidavit in support of the Government's Application for ancillary orders and warrants (a) to the Service Provider, and any Successor Service Provider, for (i) necessary technical support to accomplish the interception, pursuant to 18 U.S.C. § 2518(4); (ii) pen register and trap and trace information for the Target Cellphone pursuant to 18 U.S.C. §§ 3121 *et seq.*; and (iii) geolocation information for the Target Cellphone, pursuant to Fed. R. Crim. P. 41, with delayed notification to the person affected pursuant to Rule 41(f)(3) & 18 U.S.C. § 3103a(b); and (b) to any wire and electronic communications service provider, pursuant to 18 U.S.C. § 2703(d) for expedited provision of subscriber, toll and service records for telephones and communications devices in communication with the Target Cellphone or otherwise related to the interception requested herein.

### C. Target Subjects.

As also set forth in the Application, the Target Subjects whose communications are sought to be intercepted are: JOSEPH DATELLO, a/k/a "Big Joe," a/k/a "Joey Glasses;" CARLOS GOMEZ, a/k/a "Go Go;" FRANK SCARPATI; DOMINIC "Dom" TRUSCELLO; RICHARD "Richie" O'CONNOR; LOUIS "Louie" BORELLI; and others unknown.

### D. Target Offenses

As also set forth in the Application, the Target Offenses that are the subject of this Application, each of which is predicate offense under 18 U.S.C. § 2516, are: offenses involving the distribution, and possession with intent to distribute, of controlled substances, to wit, cocaine and heroin, the use of wire facilities to facilitate the same, the maintenance of drug-involved

premises, conspiracy to do the same and attempts to do the same, in violation of 21 U.S.C. §§ 841, 843(b), 846, 848, and 856, and Title 46, United States Code, Section 70503; racketeering and racketeering conspiracy (Racketeer Influenced and Corrupt Organizations "RICO"), in violation of 18 U.S.C. §§ 1962(c) and (d), and punishable under 18 U.S.C. § 1963, by conducting the affairs of an "enterprise," that is, a group of individuals associated in fact, although not a legal entity, to wit: the Target Subjects and others, the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity consisting of the violations of Title 21, United States Code, Sections 841, 843, 846, 848, and 856 (drug trafficking); and Title 46, United States Code, Section 70503, collectively, the "Target Offenses."

### E.  Objectives of the Interception

As also set forth in the Application, the objectives of the interception sought herein are to reveal to the greatest extent possible: (i) the nature, extent and methods of the Target Subjects' commission of the Target Offenses; (ii) the identities of the Target Subjects, to the extent currently unknown, as well as their accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (iii) the source, receipt, and distribution of contraband, and money involved in those activities; (iv) the locations and items used in furtherance of those activities; (v) the existence and locations of records; (vi) the locations and sources of resources used to finance their illegal activities; (vii) the locations and disposition of the proceeds from and relating to those activities; and (viii) the location and other information necessary to seize and or forfeit contraband, money and items of value, and other evidence of or proceeds of the commission of the Target Offenses. In addition, these interceptions are expected to constitute admissible evidence of the commission of the Target Offenses.

## F. Target Cellphone and Service Provider
### 1. Target Cellphone and Successor Target Cellphone Identifiers – General

The Target Cellphone is a Verizon cellphone that uses CDMA (for Code Division Multiple Access) cellphone technology. CDMA cellphones have a serial number - an "ESN" (Electronic Serial Number), "MEID" (Mobile Equipment Identification Number), or "IMEI" (International Mobile Equipment Identifier) - stored on a built-in, non-removable memory chip within the cellphone. To permit communication with the cellphone via a telephone number, the CDMA service provider designates the telephone number (which is sometimes referred to as a Mobile Identification Number, or MIN) to a device bearing the given ESN, MEIN, or IMEI. A customer who has obtained a new cellphone can ask the service provider to designate the old telephone number to the new device with the new ESN, MEIN, or IMEI; conversely, a customer may also retain his or her current cellphone device, but request that a new telephone number be assigned to the device. It is to capture communications after any such switches in customer service that authorization to intercept "successor" cellphones is sought. At this time, the key identifier for the Target Cellphone, and the means by which it will be identified to the Service Provider for installation of the intercept, is the telephone number. The telephone number for the Target Cellphone is 917-670-2504, its IMEI is 9900042008143000, and it is subscribed to under "Lorenzo Gallo, The Safety Group, Ltd., 11 Hannover Sq Ste 15 Fl Wall Street New York 10005-2818."

### 2. Successor Service Provider

I know from the foregoing that the user of such a cellphone can switch the provider of service to that cellphone from one service provider to another service provider ("Successor Service Provider").

2013.07.17                                     6

### 3. Target Cellphone

As set forth in more detail below under the heading, "The Investigation and Probable Cause," there is probable cause to believe that DATELLO has been using, is using, and will continue to use a cellular telephone assigned number 917-670-2504, with the IMEI 9900042008143000, subscribed to by "Lorenzo Gallo, The Safety Group, Ltd., 11 Hannover Sq Ste 15 Fl Wall Street New York 10005-2818" with service provided by Verizon ("Target Cellphone").

### 4. Application to Successor Target Cellphone and Successor Service Provider.

To avoid interruption in the execution of the Order of Interception, it is requested that the Order of Interception apply without further order of this Court to any Successor Target Cellphones, as well as to any Successor Service Provider for the Target Cellphone. Further, unless otherwise indicated, references herein to the "Target Cellphone" or "Service Provider" include any successors thereto.   The authorization sought is intended to apply not only to the target telephone number listed above, but also to any other telephone number subsequently assigned to or used by the instrument bearing the same IMEI used by the target telephone, within the thirty-day period.   The authorization is also intended to apply to the target telephone number referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephone while the telephone is off the hook or otherwise in use.

### G. Communications Features of Target Cellphone
### 1. Wire Communications Capabilities

In addition to normal voice communications capabilities, the Service Provider for the Target Cellphone has advised us that the Target Cellphone has voicemail capabilities. It is

requested that the Order of Interception also apply to messages left to, and retrieved from, voicemail that are otherwise subject to interception under Title III.

### H.  Background Conversations

It is common practice that individuals using cellphones frequently speak in the presence of and while personally communicating with other individuals on the subjects related to the cellphone communication. It is accordingly requested that the Order of Interception also apply to background conversations overheard over the Target Cellphone while the Target Cellphone is active or otherwise in use, that are otherwise subject to interception under Title III.

### I.  Territorial Scope and Jurisdiction

This Court has territorial jurisdiction to authorize the interception of wire and electronic communications sought in this application because, as a technical matter, all interceptions will automatically be routed to, and first heard or otherwise reviewed in, the Eastern District of New York even if the Target Cellphone is not physically located in the Eastern District of New York. In the event the Target Cellphone leaves the United States during the period of interception, interceptions will continue to be routed to, and first heard or otherwise reviewed in, the Eastern District of New York, to the extent the Target Cellphone's communications continue to be transmitted via the Service Provider's system.

### J.  Period of Interception

As set forth in the Application, the FBI will execute the Order of Interception as soon as practicable after it is signed. Inasmuch as the illegal operation described herein is a continuing conspiracy involving numerous persons as yet unidentified and unknown, it is requested that authorization to intercept not automatically terminate when the first communication described herein has been obtained, but rather continue until the Objectives of the Interception are fully

2013.07.17                                   8

achieved, or for a period of thirty (30) days, whichever is earlier. The thirty days is measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under the Order of Interception, or ten days from the date of that Order.

### K.  Monitoring Agents and Personnel

Consistent with 18 U.S.C. § 2518(5), the interceptions for which authorization is sought will be conducted only by law enforcement personnel, and by individuals operating under a contract with the Government under the supervision of an investigative or law enforcement officer authorized to conduct the interception.

### L.  Minimization of Wire Communications

Consistent with 18 U.S.C. § 2518(5), monitoring agents and personnel will conduct the interception in such a way as to minimize the interception of wire communications not otherwise subject to interception under Title III. Monitoring of conversations will terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Title III. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the Target Subjects or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If a conversation has been minimized, the monitoring agents will spot check to ensure that the conversation has not turned to criminal matters. In the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization will be accomplished as soon as practicable after such interception. Monitoring agents and personnel will also operate

2013.07.17

under specific Minimization Instructions provided by the Assistant United States Attorney supervising the interception.

### M.  Prior Applications

I have been informed that reviews of the electronic surveillance files were conducted for the Drug Enforcement Administration on August 11, 2015; the Federal Bureau of Investigation on August 11, 2015; and United States Immigration and Customs Enforcement on August 11, 2015, and that those reviews revealed no prior applications for Court authorization to intercept wire, oral, or electronic communications involving the Target Cellphone, the Target Subjects, or the places named herein, except as follows:

On August 14, 2015, this Court issued an order authorizing the interception of wire communications that lists DATELLO and GOMEZ, among others, as target subjects. Interception pursuant to that order is currently ongoing, and is anticipated to continue up to and including September 16, 2015.   GOMEZ's communications have been intercepted, and DATELLO's are expected to be.

DATELLO, O'CONNOR, and TRUSCELLO were named as a target subjects in multiple orders of interception issued in the United States District Court for the Southern District of New York, specifically in orders issued on or about August 15, 2008 by Judge Richard J. Sullivan; on or about July 15, 2008 by Judge Denise L. Cote; also on or about July 15, 2008, by Laura T. Swain; on or about June 13, 2008 by Judge John G. Koetl; and on or about May 14, 2008, by Judge Loretta A. Preska.  These wiretaps, and the other 2008 wiretaps (collectively the "2008 Wiretaps") discussed below, focused on other members of the Luchese family who are not Target Subjects named herein.  The 2008 Wiretaps ceased interception in or about November

2013.07.17                                                              10

2008, and led to the arrest of several Luchese Family member and associates, although not DATELLO, O'CONNOR, or TRUSCELLO, who, as mentioned above, were not the primary focus of the investigation involving the 2008 Wiretaps.

A "Joseph Datello," who is believed to be the same JOSEPH DATELLO named as a Target Subject here, has also been named as a target subject in multiple orders of interception issued by the United States District Courts for the Eastern and Southern Districts of New York in the 1990s. Specifically, in Eastern District orders issued on or about May 6, 1999, December 10, 1997 and April 2, 1997; and in Southern District orders issued on or about; July 1, 1998; June 1, 1998; and April 24, 1998.

A "Richard O'Connor" who is believed to be the RICHARD O'CONNOR named as a target subject herein was named in an order of interception issued by Judge Jack B. Weinstein of the United States District Court for the Eastern District of New York on or about November 12, 1981.

In addition to those orders of interception listed above, TRUSCELLO was named as a target subject in the following orders of interception issued by judges in the Southern District of New York: on or about April 15, 2008 by Judge Loretta A. Preska; on or about June 6, 2008 by Judge Richard J. Holwell; and on or about August 15, 2008, September 15, 2008; and October 15, 2008 by Judge Richard J. Sullivan. A "Dominick Truscello" who is believed to be the DOMINIC TRUSCELLO named as a target subject herein was also named as a target subject in orders issued by the United States District Court for the Eastern District of New York on or about March 4, 1999; April 1, 2002; April 12, 2002; May 8, 2002; May 21, 2002; July 18, 2002;

and August 5, 2002; and in orders issued by the United States District Court for the Southern District of New York on or about March 30, 1995; April 24, 1998; June 1, 1998; and July 1, 1998.

The name "Carlos Gomez" appears in numerous orders of interception issued by multiple courts over the last two decades, but this is a common name and none of the persons appearing in those orders are presently believed to be the CARLOS GOMEZ named as a Target Subject here.

## II.   The Investigation and Probable Cause
### A.   Probable Cause

For the reasons set out in this affidavit, I respectfully submit that there is probable cause to believe that one or more of the Target Subjects have committed, are currently committing, and will continue for at least the next 30 days to commit one or more of the Target Offenses; that one or more of the Target Subjects, during the period of interception sought, will use the Target Cellphone within the Eastern District of New York and elsewhere within the United States, in furtherance of, in connection with, to facilitate, to accomplish, and to commit the Target Offenses specified herein; that such communications will occur on a continuing basis during the period of interception requested; and that the interception sought herein will achieve the Objectives of the Interception.

### B.   Basis and Scope of Declarations

This case is being investigated by the FBI. I have personally participated in the investigation and I make this affidavit based on my personal participation in this investigation, and based on reports made to me by FBI agents, analysts, and other law enforcement authorities. The technical information set forth herein is additionally based on agency training, review of agency and industry technical publications, information obtained from service providers, and

2013.07.17                                        12

review of other wiretap applications. Except where otherwise noted or the context otherwise makes clear, (i) the information set forth in this affidavit may include information provided to me by other law enforcement agents who have assisted in the investigation; (ii) wherever in this affidavit I assert that a statement was made, the statement was made by another law enforcement officer (any of whom may have had either direct or hearsay knowledge of that statement) to whom I or other law enforcement officers have spoken or whose reports I have read and reviewed; (iii) such statements are reported in substance and in part; (iv) where I refer to the contents of previously recorded conversations (*e.g.*, consensual recordings or prior wiretap interceptions), my quotations and descriptions are based on preliminary draft transcripts and/or translations of those conversations; and (v) information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance. Further, because this affidavit is being submitted for the limited purpose of securing an order authorizing the interception of wire communications, I have not included details of every aspect of this investigation to date. Facts not set forth herein are not being relied on in reaching my conclusion that orders should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application for an order authorizing the interception of wire communications.

### C. Details of the Investigation
#### 1. Background to the Investigation

      a. Since in or about 2013, I have participated in the FBI's long-running investigation of the Luchese LCN organized crime Family (the "Luchese Family"). The Luchese Family has an established track record of criminal activity, including, among acts, murder, attempted

2013.07.17

murder, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), extortion, money laundering, and narcotics trafficking. Among other members of the Luchese Family, I believe that JOSEPH DATELLO, a/k/a "Big Joe," a/k/a "Joey Glasses," is a "Soldier" of the Luchese Family. This determination is based on, among other things, DATELLO's criminal record, physical surveillance of known and suspected meetings of Luchese Family members, consensually-recorded conversations among Luchese Family associates, including DATELLO, and reporting by a cooperating witness ("CI-1"),[1] some of which is described below. I know based on my training, experience, and participation in the Investigation that a soldier in an LCN family is a formally accepted member of that organization, who has taken an oath of loyalty to the family and who commits criminal acts at the behest of higher-ranking members of the family.

      b. Since in or about August 2012, CI-1 has undertaken actions at the direction of the FBI in order to further the Investigation. I know from my review of CI-1's criminal history, my and other FBI Special Agents' conversations with CI-1, and consensually-recorded conversations made by CI-1 at the FBI's direction, among other things, that CI-1 is an "associate" of the Luchese Family. Associates are not formally accepted members of an LCN family, but have an

---

[1] CI-1 has been cooperating with law enforcement for approximately three years. CI-1 is being paid for CI-1's cooperation. Information provided by CI-1 has proven reliable and has been corroborated, in part, by physical surveillance, physical evidence, audio recordings made by CI-1 at in-person meetings and, pursuant to a court-authorized consensual wiretap of phones used by CI-1, and information already known by law enforcement, some of which is discussed below. CI-1 has sustained multiple felony convictions, including an attempted murder at the behest of Luchese Family members and an attempted robbery. CI-1 has also sustained misdemeanor convictions for theft and narcotics offenses.

established and habitual relationship with members of an LCN family, and participate in the organization's criminal activities. Associates and Soldiers who conduct criminal activities as part of an organized crime family pay a portion of the proceeds to the family's more senior members as "tribute." Among the Luchese Family members that CI-1 routinely associates with is DATELLO.

## 2.  DATELLO, CI-1 and Others Plan and Conduct Criminal Activities.

a.  On or about July 15, 2014, DATELLO met with CI-1 in the vicinity of 48th Street and 9th Avenue in Manhattan, New York. In a recorded conversation,[2] CI-1 conveyed to DATELLO that CI-1 had had a falling out with MATTHEW "Matty" MADONNA, the Acting Boss of the Luchese Family and JOHN CASTELLUCI, a/k/a "Big John: a Captain (or "Capo") in the Luchese Family. DATELLO informed CI-1 that he nonetheless wished to do business with CI-1. CI-1 provided $200 in "tribute" – a percentage of the profit from criminal activities typically presented by lower ranking members or associates of LCN families to higher ranking members – from a supposed illegal transaction in untaxed, stolen cigarettes.[3] DATELLO

---

[2]   Any meeting or conversation described as recorded herein was recorded using concealed audio devices provided by the FBI and worn or emplaced by one or more participants in the meeting or conversation. Accounts of recorded meetings are based on these recordings plus debriefing of CI-1 and the undercover officers described below who participated in the recorded meeting.

[3]   As part of this investigation, the FBI has provided cigarettes to CI-1 that do not bear the required New York State tax stamp, and which CI-1 has presented to DATELLO and others as stolen, in order to provide CI-1 an apparent source of illegal revenue that would entice LCN members to interact with CI-1. All references to cigarette transactions herein concern these ostensibly stolen, untaxed cigarettes.

indicated that he could soon provide a union job to CI-1, and asked CI-1 to obtain an ounce of marijuana that DATELLO could present to his girlfriend.

b.   On or about July 24, 2014, CI-1 met DATELLO in Manhattan, New York.   CI-1 again provided DATELLO with tribute from an illegal cigarette transaction, and DATELLO again discussed obtaining a union job for CI-1.   DATELLO also informed CI-1 that DATELLO did not want CI-1 to purchase narcotics from other Luchese Family soldiers and associates, including BRIAN VAUGHAN.   Based on, among other things, my review of FBI records, my conversations with CI-1, and my review of recorded conversations between CI-1 and VAUGHAN, I believe that VAUGHAN is an associate of the Luchese Family, who has previously engaged in narcotics trafficking and labor racketeering for the Family, and who has the personal confidence of MADONNA.   In lieu of purchasing narcotics from others, DATELLO proposed that CI-1 purchase narcotics from an individual, later determined to be CARLOS GOMEZ, a/k/a "Go Go," with whom DATELLO had previously been incarcerated.   DATELLO and CI-1 agreed that CI-1 would purchase $2,100 worth of marijuana from DATELLO and GOMEZ.

c.   On or about August 19, 2014, DATELLO and CI-1 met at restaurant in Staten Island, New York.   Also present was an undercover FBI agent ("UC-1"), who CI-1 introduced to DATELLO as, among other things, involved in trafficking narcotics and untaxed cigarettes.   In a recorded conversation, DATELLO, CI-1, and UC-1 discussed further transactions in untaxed cigarettes, as well as a potential heroin transaction with an unnamed Dominican associate of DATELLO's, later determined to be GOMEZ, and that DATELLO owed a debt to STEVEN

"Stevie" CREA, the Underboss of the Luchese Family. According to DATELLO, DATELLO and an associate of DATELLO's had previously received a $100,000 loan from CREA as part of an extortionate enterprise, but the associate had provided information to law enforcement, resulting in the failure of the extortionate scheme and the incarceration of CREA and DATELLO. MADONNA was now forcing DATELLO to repay the $100,000 to CREA. DATELLO also informed CI-1 and UC-1 that MADONNA and CREA had directed the murder of MICHAEL MELDISH for failing to repay a debt MELDISH owed to MADONNA. I know from my participation in this investigation, and my review of FBI and public records, that MELDISH was a Luchese Family associate who was murdered on or about November 15, 2013.

      d. On or about October 23, 2014, DATELLO arranged for CI-1 to meet GOMEZ in the parking lot of a commercial location in Staten Island, New York. GOMEZ was initially late for the meeting, and DATELLO met CI-1 to ensure CI-1 would wait for GOMEZ to arrive. After DATELLO departed, GOMEZ arrived at the location in a Black Acura MDX (the "Acura"). During a recorded meeting, GOMEZ entered CI-1's vehicle and provided CI-1 with what GOMEZ presented as one kilogram of cocaine, in return for which CI-1 provided GOMEZ with $45,000 (which had been supplied by the FBI). GOMEZ informed CI-1 that this cocaine was not from GOMEZ's typical source, but was provided as a favor to DATELLO. GOMEZ stated that he had a shipment of cocaine from his regular source available in approximately three weeks, that this cocaine was higher quality, and that GOMEZ could sell that cocaine to CI-1. CI-1 inquired whether GOMEZ also had access to heroin. GOMEZ stated that he had offered to provide DATELLO with a kilogram of heroin recently, and provided DATELLO with an actual

sample, but that DATELLO had been unable to find customers for the heroin and so no sale was made. The FBI recovered the cocaine provided by CI-1, and confirmed that although it was in fact cocaine, substantially less than one kilogram was provided. GOMEZ subsequently provided the remainder of the promised kilogram to CI-1 on or about October 24, 2014.

e. On or about November 7, 2014, CI-1 met VAUGHAN, and the two drove together in a car in New York and New Jersey. During a recorded conversation, VAUGHAN discussed, among other things, VAUGHAN's previous purchases of kilogram-quantities of cocaine from multiple sources, VAUGHAN's close association with MADONNA and MELDISH, and VAUGHAN's proposal that CI-1 rob GOMEZ rather than do business with him.

f. Also on or about November 7, 2014, DATELLO, GOMEZ, CI-1, and UC-1 met at a restaurant in Manhattan, New York. Also present was an individual accompanying GOMEZ, who was introduced by GOMEZ as "Felix," and was subsequently identified by the FBI as FELIX VASQUEZ. At this meeting, which was recorded by law enforcement, DATELLO, GOMEZ, VASQUEZ, CI-1 and UC-1 discussed, among other things, a potential deal for five kilograms of cocaine. In addition, GOMEZ stated that he could arrange a deal for 1,000 kilograms of cocaine through his Dominican contacts, ultimately sourced in Peru. During this meeting GOMEZ provided CI-1 with a sample of cocaine in anticipation of the future transactions.[4]

---

[4] The FBI recovered the sample, and confirmed it to be one gram of cocaine. Unless otherwise stated, quantities of narcotics described herein as provided to CI-1 were recovered by the FBI and confirmed to be the type and approximate quantity represented.

g. On or about November 20, 2014, VAUGHAN met CI-1 at a restaurant in New Jersey. In a recorded conversation, VAUGHAN and CI-1 discussed, among other things, DATELLO's debt to CREA and a recent payment DATELLO made toward that debt, and CI-1's planned cocaine transactions with DATELLO, GOMEZ, and UC-1.

h. On or about December 3, 2014, CI-1 and GOMEZ met in Queens, New York. In a recorded conversation, CI-1 and GOMEZ discussed, among other things, DATELLO's debt to CREA, and DATELLO's intent to pay that debt using DATELLO's profits from the narcotics transactions being planned and conducted by CI-1, GOMEZ, DATELLO, and UC-1.

i. Also on or about December 3, 2014, DATELLO, CI-1, and UC-1 met at a restaurant in Queens, New York. In a recorded conversation, they discussed, among other things, UC-1's purported ability to receive a large shipment of cocaine at a port in Greece in Greece, DATELLO's desire to ship cocaine directly to Greece, and GOMEZ's plans to obtain a sample of heroin from a source in Connecticut.

j. On or about December 23, 2014, DATELLO, GOMEZ, CI-1, and UC-1, met at various locations in Queens, New York. While in an undercover FBI vehicle used by UC-1, DATELLO, GOMEZ, CI-1, and UC-1 had a recorded conversation, during which they discussed, among other things, narcotics trafficking and the need for increased security in their communications. To further the latter objective, DATELLO proposed obtaining disposable

2013.07.17

"burn" phones to be used by DATELLO, GOMEZ, CI-1, and UC-1 for planning future transactions.[5]

k.    On or about January 8, 2015, GOMEZ, CI-1, and UC-1 met to discuss a future large-scale cocaine transaction in the vicinity of GOMEZ's residence in Queens, New York. In a recorded conversation, GOMEZ stated, among other things, his ability to obtain 1,200 kilograms of cocaine from a Colonel in the Dominican Republic named, in part, "Valerio." According to GOMEZ, the Colonel was involved in some fashion in stealing the 1,200 kilograms of cocaine after it had been seized by law enforcement. Although the Colonel was currently under house arrest for this, once suspicion lifted he could possibly provide the cocaine to GOMEZ. The FBI believes "Valerio" to be CARLOS FERNANDEZ VALERIO, a Colonel in the Dominican Narcotics Police Division, based on a news report that VALERIO was detained for the loss of 1,200 kilograms of cocaine in his custody. GOMEZ, CI-1, and UC-1 also discussed obtaining new cellphones to use for narcotics transactions, and, at GOMEZ's request, agreed that DATELLO should continue to be part of the transactions. The parties discussed the need for GOMEZ to travel to the Dominican Republic to renew contacts there and arrange for future

_____

[5] The conversations and meetings described in this affidavit do not constitute all the meetings or conversations I am aware of between DATELLO, GOMEZ, CI-1, and UC-1. Among other things, DATELLO, GOMEZ, CI-1, and/or UC-1 conducted at least eight meetings not otherwise described herein at which narcotics transactions were discussed, GOMEZ and CI-1 engaged in other narcotics transactions, GOMEZ presented at least two samples of heroin to CI-1 of which CI-1 questioned the quality and authenticity, and the co-conspirators engaged in numerous transactions of untaxed cigarettes.

transactions. CI-1 also provided GOMEZ with payment for a kilogram of cocaine and discussed the imminent purchase of a half-kilogram of heroin.[6]

l.   On or about January 30, 2015, UC-1 provided DATELLO approximately $300 to purchase disposable phones (the "First Burn Phones") for use by DATELLO, GOMEZ, CI-1, and UC-1.   Shortly thereafter DATELLO distributed the First Burn Phones to GOMEZ, CI-1, and UC-1, and himself pursuant to their earlier agreement (on or about December 23, 2015, as discussed above) to use "burn" phones to plan future narcotics transactions.

m.   On or about January 30, 2015, DATELLO, CI-1, and UC-1 traveled together to and from a restaurant in Staten Island, New York, where they shared a meal.   In a recorded conversation, DATELLO complained to CI-1 that CI-1 had spoken with third parties about their planned narcotics transactions with GOMEZ.   According to DATELLO, as a result of this CREA and other members of the Luchese Family leadership were expressly told that the $5,000 per month DATELLO was paying CREA toward the previously discussed debt derived in significant part from the narcotics transactions DATELLO, CI-1, GOMEZ, and UC-1 were conducting. This was problematic for DATELLO because although the Luchese Family is routinely involved in narcotics trafficking, as a formality the Family still espouses a traditional code against doing so.   DATELLO also told CI-1 that CREA had informed DATELLO he knew that DATELLO was engaged in narcotics trafficking and would kill him if he heard about that again, but would continue to accept $5,000 per month from DATELLO nonetheless.   DATELLO further informed

---

[6] In a previous application to this Court for a wiretap on a phone used by GOMEZ, my affidavit described the amount of heroin in question as a full kilogram.   On further review of FBI records and notes, the amount discussed during this transaction was one half kilogram.

CI-1 that Luchese family dynamics will improve for CI-1 and DATELLO once MADONNA begins an anticipated term of imprisonment.

n. On or about February 5, 2015, in a recorded meeting, UC-1 spoke with DATELLO. In addition to discussing narcotics transactions, DATELLO voiced concern about the Government's ability to intercept telephone calls and about the possibility that some party to the planned transaction was a government agent.

o. On or about March 4, 2015, DATELLO, GOMEZ, CI-1, UC-1, and a second undercover FBI agent ("UC-2"), who CI-1 had previously introduced as a person able to finance significant narcotics purchases and to repatriate money, met at restaurant in Manhattan, New York. In a recorded conversation, the parties again discussed a cocaine transaction in the 1,000 kilogram range, involving GOMEZ travelling to the Dominican Republic to secure sources of cocaine, and shipment to Greece by commercial vessel, where UC-1's supposed associates would receive it. GOMEZ also discussed his need for significant sums of money for his trip to the Dominican Republic, so that he could show his contacts that he is serious and travel in the manner expected of a significant player in the narcotics trade.

p. On or about March 11, 2015, in a transaction recorded by law enforcement, CI-1 purchased one kilogram of cocaine from GOMEZ on consignment, with an arranged purchase price of $45,000. On or about March 12, 2015, also in a recorded transaction, CI paid GOMEZ $44,475 for the cocaine, the price being reduced slightly as part of a separate transaction for untaxed cigarettes completed by GOMEZ and CI-1.

2013.07.17

q.   On or about March 18, 2015, CI-1 met DATELLO at DATELLO's home in Staten Island, New York.  In a meeting that was not recorded because CI-1's recording device malfunctioned, CI-1 explained to DATELLO that MADONNA had avoided bringing CI-1 more deeply into the Luchese family because MADONNA had previously cut CI-1 out of a transaction arranged by VITTORIO "Vic" AMUSO, the imprisoned Boss of the Luchese Family. DATELLO told CI-1 that once MADONNA went to prison, DATELLO would be better able to support CI-1's induction into the Family through TRUSCELLO and CREA.  DATELLO informed CI-1 that TRUSCELLO and CREA would likely ascend in authority at that time, and discussed their previous success in having several Family associates "made," becoming Soldiers. DATELLO also repeated that MADONNA had ordered MELDISH killed, and implied that he knew the identity of the killers, but did not specify it.

r.   On or about March 28, 2015, DATELLO and UC-1 met at a restaurant in Queens, New York.  In a conversation recorded by UC-1, DATELLO stated, among other things, that GOMEZ could obtain cocaine in the Dominican Republic for $16,000 to $17,000 per kilogram, but the price increases substantially for shipment to the United States; that DATELLO could begin transporting cocaine to southern New Jersey to increase profits; and that although the FBI is investigating DATELLO, they do not believe him to be engaged in trafficking cocaine.

s.   On or about April 15, 2015, CI-1 met DATELLO in Staten Island, New York.  In a recorded conversation, DATELLO told CI-1, among other things, that DATELLO would put CI-1 in contact with LOUIS BORELLI and RICHARD "Richie" O'CONNOR to conduct illegal cigarette transactions.   I know from my review of FBI and criminal records, and my

2013.07.17                                        23

conversations with CI-1, that BORELLI is an associate of the Gambino LCN family who has since been charged with money laundering and possession with intent to distribute narcotics, in King George County, Virginia. I also know from my review of FBI and criminal records, and my conversations with CI-1 that O'CONNOR is an associate of the Genovese LCN family who has two prior felony convictions for narcotics distribution. DATELLO also told CI-1 that DATELLO had put CI-1's association and criminal activities with DATELLO on record with TRUSCELLO, meaning that DATELLO had reported his illegal activities with CI-1 to TRUSCELLO and was paying a portion of the proceeds from those activities to TRUSCELLO, and that CI-1 would now be protected by the Luchese Family. DATELLO further informed CI-1 that DATELLO was prepared to recommend to TRUSCELLO that CI-1 be made a Soldier once MADONNA was imprisoned, and that O'CONNOR had already spoken to TRUSCELLO on CI-1's behalf.

t.   On or about April 16, 2015, DATELLO, GOMEZ, CI-1, UC-1, and UC-2 met at a restaurant in Manhattan, New York. In a transaction recorded by law enforcement, CI-1 distributed new burn phones (the "Second Burn Phones") to DATELLO, GOMEZ, CI-1, UC-1, and UC-2.

u.   I know from speaking with CI-1 and from listening to telephone calls between CI-1 and GOMEZ that were consensually recorded by CI-1, that from on or about April 23, 2015 to on or about May 10, 2015, GOMEZ traveled to the Dominican Republic for the purpose of obtaining commitments from Dominican narcotics traffickers to provide 1,000 kilogram quantities of cocaine as part of the plan with DATELLO, CI-1, UC-1, and UC-2. During that

2013.07.17                                    24

time CI-1 and GOMEZ exchanged telephone calls in which GOMEZ reported making contact with various potential cocaine suppliers.

v.   On or about May 10, 2015, CI-1 picked-up GOMEZ at JFK International Airport, on GOMEZ's return from the Dominican Republic.  In a recorded conversation, GOMEZ stated, among other things:  That he could obtain cocaine originating from Venezuela, Ecuador, or Peru; that he had identified three different potential suppliers for cocaine; potential purchase prices; a possible "test run" of 10-15 kilograms before doing a 1,000 kilogram deal; and using caution when speaking with DATELLO on the phone because DATELLO may be under FBI surveillance.  In addition, GOMEZ and CI-1 discussed the need for CI-1 to obtain a new burn phone, because CI-1 had used CI-1's Second Burn Phone in conversations with GOMEZ while GOMEZ was in the Dominican Republic.

w.   On or about May 16, 2015, CI-1 obtained a new disposable phone ("CI-1's Third Burn Phone") with the call number 917-753-1896.

x.   On or about May 17, 2015, DATELLO, GOMEZ, CI-1, UC-1, and UC-2 met in a hotel in Manhattan, New York.  In a recorded conversation the parties discussed, among other things, financing and logistics for the planned cocaine transaction in the amount of approximately 1,000 kilograms; likely obtaining cocaine originating in Peru; and various government officers in the Dominican Republic complicit in the cocaine trade.  Of particular concern to GOMEZ, UC-1 and UC-2 purported to be unable to complete the planned transaction until the early fall, whereas GOMEZ had informed his sources of supply that the deal would be consummated more quickly.

2013.07.17

25

y.   On or about May 30, 2015, CI-1 met O'CONNOR and CARMINE GARCIA at a restaurant in Matawan, New Jersey.  In a recorded conversation, O'CONNOR, GARCIA, and CI-1 discussed previous and future narcotics transactions, including the planned deal with GOMEZ and home invasions they believed to have been conducted by CHRISTOPHER LONDONIO and PASQUALE MAOIRINO, a/k/a "Patty Boy;" possible perpetrators of the MELDISH murder -- which they believed to have been carried out by LONDONIO at the direction of the Luchese Family.

z.   On or about June 5, 2015, CI-1 met GOMEZ and GOMEZ's brother-in-law, CARLOS SERRA, in the parking lot of a restaurant in New Jersey.  In a recorded conversation, GOMEZ informed CI-1 that GOMEZ's suppliers in the Dominican Republic had sold 700 kilograms of the 1,000 kilograms they originally planned to sell GOMEZ, before learning that the contemplated transaction could not be completed in the immediate future.  GOMEZ inquired whether DATELLO, CI-1, UC-1, and UC-2 might purchase the remaining 300 kilograms, perhaps as a test run.  During this meeting, CI-1 observed what appeared to be a kilogram-sized package of cocaine in the Acura.

aa. On or about June 11, 2015, CI-1 met DATELLO at a restaurant in Staten Island, New York.  Much of the conversation concerned the business of the Luchese Family, to include the anticipated effect of MADONNA beginning a prison sentence, the concerns of MADONNA's subordinate Luchese Family Captain (or "Capo") DOMINIC TRUSCELLO, the murder of MELDISH, and the debt DATELLO owed to CREA.  CI-1 and DATELLO also discussed the need for GOMEZ to behave more cautiously, in response to recent events in which

GOMEZ had been driving in the Acura while drinking and carrying one kilogram of cocaine. DATELLO indicated that he had spoken with GOMEZ about this incident.

bb. On or about June 14, 2015, DATELLO, GOMEZ, and UC-1 met at a restaurant in Queens, New York.   In a recorded conversation they discussed, among other things, the merits of conducting the 300 kilogram cocaine purchase proposed by GOMEZ, the need for GOMEZ to behave more cautiously to avoid law enforcement attention prior to completing the main transaction, and a loan that has been advanced to GOMEZ.[7] In the course of discussing the possible 300 kilogram cocaine transaction, DATELLO stated to UC-1 that the profit from a 300 kilogram deal would be sufficient for DATELLO to get out of trouble and settled, which I know from the context of the investigation, my debriefing of CI-1, and my debriefing of a second confidential informant ("CI-2")[8] with knowledge of Luchese Family structure and operations, refers to payments DATELLO would make to the Luchese Family hierarchy, and specifically to CREA.

---

[7] In a previous application to this Court for a wiretap on a phone used by GOMEZ, my affidavit described the discussion as concerning, among other things "various loans that have been advanced to GOMEZ."  On further review of FBI records and notes, only one of the loans to GOMEZ was discussed on this date.

[8]      CI-2 has been cooperating with law enforcement for more than five years.  CI-2 is being paid for CI-2's cooperation.  Information provided by CI-2 has proven reliable and has been corroborated, in part, by physical surveillance, audio recordings made by CI-1 at in-person meetings and, pursuant to a court-authorized consensual wiretap of phones used by CI-1, and information already known by law enforcement, some of which is discussed herein.  CI-2 has sustained at least one felony conviction, and is known to the FBI as a member of the Luchese Family.

cc. On or about July 19, 2015, GOMEZ, CI-1, and UC-2 met at a hotel in Manhattan, New York. In a recorded conversation, they discussed, among other things, the logistics of the planned transaction for approximately 1,000 kilograms of cocaine, to be provided by GOMEZ's sources in the Dominican Republic and shipped to Greece by ocean-going vessel. Among those arrangements, GOMEZ stated that $175,000 would pass to persons in Peru responsible for loading the cocaine onto the ship which would transport it to a Greek port through GOMEZ's brother in law, SERRA. In addition, GOMEZ and CI-1 discussed 20 kilograms of cocaine that GOMEZ had been separately planning to receive, with GOMEZ informing CI-1 that there were problems with the shipment and only four kilograms were now available.

### 3. DATELLO Uses the TARGET CELLPHONE to Coordinate Criminal Activity.

I have reviewed recordings of calls placed between CI-1's cellphone and the TARGET CELLPHONE, as indicated by pen registers placed on CI-1's cellphone and on the TARGET CELLPHONE. During these calls, CI-1 speaks with DATELLO, who I know to be the user of the TARGET CELLPHONE because, among other things, DATELLO provided the TARGET CELLPHONE's call number to CI-1 as his phone number, and CI-1, other FBI agents, and I recognize the voice on the TARGET CELLPHONE's to be DATELLO's. Among other calls I have listened to are the following:

a. On or about July 5, 2015, the following conversation between CI-1's cellphone and the TARGET CELLPHONE was recorded, in which CI-1 and DATELLO ("JD") stated, in substance and in part:

JD      How ya doing? My other phone is out. Broke.
CI-1    Yeah? I try to call ya. Fucking, you're not answering your other phone.

JD     It's broke.  I can't charge it. You know.

. . .

JD     Uh, get to me so I can get another phone.  You know.  You gotta hook it up.

CI-1   What happened? You ran out of minutes?

JD     No, no.  The charging mechanism, where you plug it in . . .

CI-1   Um hm.

JD     Broke.

CI-1   Oh, so the phone is dead?

JD     Yeah.  The phone is completely dead. I can't start it or nothing.

CI-1   Oh, oh.

JD     I need another one.

CI-1   Alright.  I'll tell Pete. I'll, I'll get some.  I, I wanna get another phone anyway.  Um, I'll see Carlos this week and um, talk to him.

. . .

CI-1   Oh, did you go up last week or what? Or you didn't go up?

JD     What did you say?

CI-1   I said, did you go up last week?

JD     Yeah.

CI-1   Oh. How's everything with the other guy? Did he, did he wanna hook up soon or what?

JD     Yeah.  When I see ya I'll talk to ya.

"Pete" is the name given and used by UC-1.  From the context of this investigation and debriefing CI-1, I understand that the "other phone" DATELLO describes as inoperable is DATELLO's Second Burn Phone, and that because the charging port for the Second Burn Phone is inoperable, DATELLO has been using the TARGET CELLPHONE – which is DATELLO's regular phone – to communicate with CI-1 despite their plan to use burn phones to coordinate criminal activities.  I further understand, based on debriefing CI-1, the context of the recorded conversation, and the context of this investigation as discussed above, that going "up" refers to DATELLO's regular trips to the Coddington Club in the Bronx, New York (which is north of DATELLO's and CI-1's usual areas of operation in Manhattan, Queens, and Staten Island) to make regular payments to Luchese Family Underboss STEVEN CREA, as discussed above; that

the "other guy" (as opposed to CREA) is Luchese Family Captain DOMINIC TRUSCELLO, who DATELLO has told CI-1 may soon sponsor CI-1 to become a soldier in the Luchese Family.

        c.  On or about July 12, 2015, DATELLO used the TARGET CELLPHONE to place a call to CI-1's cellphone. During that call, the following conversation, in substance and in part, was recorded:

| | |
|---|---|
| CI-1 | Carlos said that if he ends up making a couple of dollars, he was gonna help you out this week. You know what I mean? But . . . |
| JD | Yeah, what's going? |
| CI-1 | He's waiting. You know. |
| JD | Huh? |
| CI-1 | Waiting. |
| JD | Waiting and waiting huh? |
| CI-1 | That's what he's doing. That's what he's saying. Yep. |
| JD | Huh. |
| CI-1 | He's doing it any day now. It's supposed to be Friday, then Saturday . . . . |

I understand based on debriefing CI-1, the context of the recorded conversation, the context of this investigation as discussed above, and other recorded conversations, that this conversation concerns GOMEZ's plan to pay illegal proceeds from a narcotics transaction to DATELLO after GOMEZ receives an anticipated shipment of cocaine. Specifically, as discussed above, "Carlos" is CARLOS GOMEZ, and during the time of this call GOMEZ had informed CI-1, in a recorded conversation discussed above and in additional recorded telephone conversations between GOMEZ and CI-1, that GOMEZ has been anticipating a 20 kilogram shipment of cocaine, which he could then resell at a significant profit, but had been repeatedly delayed by his supplier. Thus GOMEZ's plan to "help out" DATELLO if GOMEZ "ends up making a few dollars," indicates

GOMEZ's intent to pass on some portion of the proceeds of the expected cocaine transaction to
DATELLO.

     d.  On or about August 2, 2015, CI-1 placed a recorded call to the TARGET
CELLPHONE. During that call, the following conversation, in substance and in part, occurred:

| | |
|---|---|
| CI-1 | Yeah. I just gotta call Carlos and his phone, I guess he don't have minutes. |
| JD | Well, get a hold of Pete and find out what's going on with the other things, you know, the cigarettes. |
| CI-1 | Yeah, no, I, I will. I will. And Carlos has a phone for you Joe. Did he, did he call you? |
| | . . . |
| CI-1 | No, I know. I know. I know. I have to. I'm gonna see, I'll come and see you like tomorrow or Tuesday or one day this week, okay Joe? |
| JD | Well listen, try, try to see what's going on with the other, you know, with the stuff I said. |
| CI-1 | No, I know. I'm gonna try to see what's going on with both things, you know |
| JD | Huh? |
| CI-1 | I'm trying to see what's going on with both things. Trying to get everything done you know? |
| JD | Yeah, whatever Peter thinks, you know. |
| CI-1 | I know. I know. I will and then I'll give you a call like tomorrow or Tuesday, alright? |
| JD | Okay. Sounds good. |
| CI-1 | And will meet up. Alright Joe. |

Based on debriefing CI-1, the context of the recorded conversation, and the context of this
investigation as discussed above, I understand that during this conversation, DATELLO was
asking CI-1 to inquire about the status of planned illegal transactions in untaxed cigarettes and
narcotics. Specifically, DATELLO and CI-1 discuss GOMEZ ("Carlos") and providing a new
burn phone to DATELLO. Then DATELLO directs CI-1 to talk to UC-1 ("Pete") about "the
other things . . . cigarettes," meaning the untaxed cigarettes that DATELLO believes UC-1 to
obtain, in contrast ("other") to the cocaine obtained by GOMEZ. Later in the conversation,

DATELLO repeats this directive, and CI-1 states that he will check on "both things," meaning the two types of transaction DATELLO and UC-1 are involved in, cigarettes and the planned 1,000 kilogram cocaine purchase, as reflected in the numerous recorded meetings discussed above.

### D.   Analysis of Communications Records for Target Cellphone

I and other FBI agents have analyzed toll records obtained through a court-ordered pen register placed on the TARGET CELLPHONE for the 30-day period beginning on or about July 20, 2015, and ending on or about August 20, 2015 (the "30-Day Period"). From my review of these records, I have learned the following, in substance and in part:

2.   During the 30-Day Period, the TARGET CELLPHONE exchanged 142 calls with the call number 718-698-3920, with the last contact on or about August 19, 2015.   I know from debriefing CI-1, who has exchanged calls with the number on numerous occasions as verified by pen registers on CI-1's phones, that this number is used by LOUIS "Louie" BORELLI.   As discussed above, BORELLI is a known Gambino LCN Family associate, with whom DATELLO has directed CI-1 to conduct illegal transactions in untaxed cigarettes.

3.   During the 30-Day Period, the TARGET CELLPHONE exchanged 10 calls with the call number 347-220-2782, with the last contact on or about August 18, 2015.   I know from reviewing State Department records that this number was listed as a contact number by FRANK SCARPATI on his 2010 passport application.   I know based on interviews with CI-2 and an independent source who has reliably reported on Luchese Family structure in the past and whose reporting is consistent with information previously known to the FBI, that SCARPATI is a Luchese Family Soldier, subordinate (like DATELLO) to Luchese Family Captain DOMINIC

TRUSCELLO.   SCARPATTI has previously been convicted of possession with intent to distribute cocaine and other illegal narcotics.

4.   During the 30-Day Period, the TARGET CELLPHONE exchanged eight calls with the call number 561-862-8639 on or about August 15, 2015.  I know from debriefing CI-1, who has exchanged calls with the number on numerous occasions as verified by pen registers on CI-1's phones, that this number is used by RICHARD "Richie" O'CONNOR.  As discussed above, O'CONNOR is a known associate of the Genovese LCN Family who also has contact with, among other LCN figures, MADONNA, the acting boss of the Luchese family.   Also as discussed above, O'CONNOR has two previous convictions for narcotics trafficking and has discussed past and planned cocaine transactions in recorded conversations with CI-1.

5.   During the 30-Day Period, the TARGET CELLPHONE exchanged one call with the call number 973-384-4134, on or about July 26, 2015.  I know from reviewing records of previous FBI investigations of the Luchese family that this number was consistently used by DOMINIC TRUSCELLO in or about 2008.  As discussed above in greater detail, TRUSCELLO is an identified Captain (or "Capo") in the Luchese Family, who is DATELLO's superior and who may at some future point sponsor CI-1's induction into the Luchese Family.  In addition to various arrests for which the ultimate disposition is unknown, TRUSCELLO has previously been convicted of money laundering, extortion, perjury, and conspiracy to commit extortion.

## III.  Normal Investigative Techniques
### A.   Insufficiency of Alternative Investigative Techniques
Consistent with 18 U.S.C. § 2518(3)(c), I respectfully submit that, for the reasons discussed below, normal investigative procedures have been tried and have failed or reasonably

appear to be unlikely to succeed if tried or to be too dangerous to achieve the Objectives of the Interception herein sought.

### 1. Undercover Officers

As discussed above, this investigation makes significant use of undercover officers. UC-1 and UC-2 have met DATELLO and GOMEZ in confidential settings and openly discussed narcotics trafficking. Law enforcement, however, will not be able to accomplish all the objectives of this investigation through the use of undercover officers. My training and experience have taught me that LCN members are unlikely to discuss the full extent of their activities or their organization's membership when dealing with an "outsider" such as a UC, or any individual who has been recently introduced to a criminal organization. A UC is accordingly unlikely to be made aware of the full scope of the activities of the Target Subjects and other co-conspirators, and is similarly unlikely to be made aware of the detailed methods by which the Luchese Family operates (including the extent to which this organization launders money and/or engages in acts of violence in furtherance if its illegal activities). Indeed, based on my experience as an organized crime investigator, I would expect that a UC would be highly unlikely to obtain any more information than necessary to complete a particular narcotics transaction.

This has proven true thus far in this case. UC-1, for example, has met with DATELLO and GOMEZ on multiple occasions, and discussed a transaction for 1,000 kilograms, or more, of cocaine, as well as illegal transactions in untaxed cigarettes. But DATELLO has disclosed very little to UC-1 regarding how the Luchese Family operates. Similarly, although GOMEZ has provided some information concerning the identity of his contacts in the Dominican drug-

trafficking organizations ("DTOs") GOMEZ that interacts with, GOMEZ has not told UC-1 all the members of the DTOs known to him, what the DTOs do with their profits, and what methods the DTO uses to obtain and control narcotics shipments that purportedly originate in other countries.

Based on my training and experience, it would be dangerous to the investigation and potentially to the UCs for the UCs to inquire about any of these subjects. LCN families and foreign DTOs typically go to considerable lengths to prevent outsiders from learning about their organizations. And because the UCs have no plausible business reason to seek this information, inquiries on these subjects would, at the very least, likely arouse suspicion of the UCs.

### 2.  Confidential Informants and Cooperating Witnesses

As discussed above, this investigation makes extensive use of a confidential informant, CI-1. CI-1's information and cooperation has formed an essential part of the FBI's investigative efforts, allowing the FBI to obtain consensual recordings of telephone and personal conversations between the Target Subjects, and introducing two undercover FBI agents, UC-1 and UC-2, to the conspiracy. In addition, CI-2 has provided some useful information concerning Luchese Family structure and membership, as discussed above.

Use of CI's will, however, be insufficient to accomplish all the goals of the investigation. As with undercover officers, I know based on my training and experience that LCN families are extremely unlikely to provide "outsiders" with many details about their organizations, such as the Luchese's full membership or its methods of operation. And although CI-1 is an associate of the Luchese Family, and has some prospect of one day becoming a Luchese "Soldier," the hierarchical nature of LCN families means that CI-1 will not have access to the higher levels of

Luchese family decision making.  That is borne out by the recorded conversations discussed above, in which CI-1 must rely on DATELLO and others to approach senior Luchese figures such as CREA and TRUSCELLO on CI-1's behalf.  Thus because DATELLO is a more senior member of the Luchese Family than CI-1, DATELLO (the user of the TARGET CELLPHONE) can always be expected to have greater access to, and to discuss a greater range of criminal activities with, Luchese Family leaders than CI-1.

With respect to CI-2, as a made member of the Luchese family, CI-2 has greater access to information concerning Luchese Family operations, structure, and membership.  CI-2, however, is not a member of the leadership of the Luchese Family, and thus CI-2 still has limited access to that information.  In addition, CI-2 is unable to testify and unwilling to use recording devices for fear of CI-2's safety.  CI-2's information therefore cannot substitute for the wire interception requested.

At present, this Investigation has not developed any cooperating witnesses to further the investigation.  Although recruiting a cooperating witness is a long-term aim of the Investigation, it is not practical to do so at present.  In particular, arresting DATELLO – the most plausible known, plausible cooperating witness as to Luchese Family – or otherwise attempting to compel him to cooperate, would likely require revealing significant portions of the investigation and thus jeopardize its objectives.  More generally, because the Investigation involves two separate criminal organizations, the Dominican DTOs and the Luchese Family, even successfully recruiting a cooperating witness from one organization would not provide access to the other organization, but would nonetheless risk compromising the investigation as a whole.  Wire

surveillance is therefore necessary to learn details about the organization, membership, and methods of operation of the relevant criminal organizations that cannot be learned by undercover agents, confidential informants, or cooperating witnesses.

### 3. Physical Surveillance

Law enforcement officers have conducted physical surveillance of DATELLO, GOMEZ, and various meetings described above. This surveillance has helped verify the accounts of CI-1. The continued use of physical surveillance, however, is not a reasonable alternative to intercepting wire communications.

First, and as the discussion above demonstrates, the Target Subjects discuss criminal activity over the telephone, which is not amenable to physical surveillance.

Second, physical surveillance is unlikely to be fruitful in this case in light of the nature of the criminal activity at issue, which consists generally of meetings typically conducted indoors, during which narcotics-trafficking and other criminal activity is discussed and sometimes conducted. Generally speaking, physical surveillance is useful in generating information concerning the identity of an individual, where he or she resides, locations he or she frequents, and the identities of the persons with whom he or she meets. But it provides limited direct evidence of the significance of the meetings. When used in conjunction with wire communication interception, however, physical surveillance has proved to be a useful investigative technique. It is expected that the information that can be obtained from the interception of wire communications over the TARGET CELLPHONE will help law enforcement agents to locate the identified Target Subjects and to identify co-conspirators, thereby enhancing the prospects for fruitful physical surveillance. In addition, with the

knowledge provided beforehand by wire surveillance that a meeting is to take place at a given location, or that proceeds or narcotics will travel over a certain route, it may be possible to establish physical surveillance at that location or on that route in advance, thus minimizing the risks of discovery inherent in following subjects or remaining at target locations for extended periods of time. But physical surveillance alone is unlikely to contribute anything more to the current investigation than has already been achieved by use of confidential informants and undercover agents.

### 4. Pole Camera

The FBI maintains a pole camera outside the Coddington Club in the Bronx, New York, which, as previously mentioned, is regularly used by Luchese Family members, and recurrently visited by DATELLO. This camera is useful in developing patterns of association between known and suspected Luchese Family members and associates. The camera will not, however, substitute for the requested wire interception. To begin with, identified members of the conspiracy, such as GOMEZ, are not members of the Luchese Family and thus do not associate at the Coddington Club. Moreover, the members of the Luchese Family meeting at the Coddington Club meet indoors, and so any discussions of this narcotics conspiracy or other criminal activity therefore cannot be recorded by the pole camera, which serves only to capture suspects coming from and going to the location.

The use of additional pole cameras is not likely to contribute meaningfully to this investigation. As discussed above, the criminal activity under investigation consists largely of telephone conversations and indoor meetings and transactions. A pole camera is of no utility in capturing a telephone conversation, and because DATELLO, GOMEZ, and others consistently

2013.07.17                                38

meet at different locations (typically restaurants), there is no consistent location where emplacing a pole camera could be expected to capture future meetings.

### 5. Geolocation Information

Geolocation information will also be insufficient to accomplish the full objectives of the investigation. Geolocation information can help law enforcement determine the particular locations that an individual frequents, but it cannot help law enforcement determine which of those locations are visited for innocuous reasons and which are visited in connection with criminal activities. Thus, even if geolocation information is used successfully to identify locations frequented by DATELLO, GOMEZ, or others, that information by itself will be insufficient to determine whether those locations are connected to narcotics activity—and therefore is unlikely to provide a basis to obtain warrants to search any particular locations. Similarly, and because it cannot differentiate between criminal and non-criminal movement, geolocation information is unlikely to provide significant insight as to Luchese Family's criminal activities, sources of supply for narcotics, past acts of violence committed by members of any of the criminal organizations under investigation, or where the proceeds of their criminal activities are stored.

### 6. Telephone Records and Pen Registers

Telephone toll records have been used and are continuing to be used in this investigation. Among other things, telephone records have assisted agents in confirming that several of the Target Subjects have been in contact with each other. For example, law enforcement agents learned that DATELLO and GOMEZ continue to communicate directly with each other, and not only through CI-1, by analyzing the call records of their respective phones.

In general, however, telephone records provide only limited information; these methods will not enable law enforcement to identify with certainty the persons involved in committing the Target Offenses, nor will they reveal the extent and nature of the activities of a drug trafficking organization.   Among other problems, it is oftentimes extremely difficult to associate an individual with a telephone number.  For example, the phone numbers discussed herein were obtained primarily from CI-1, but Target Subjects such as DATELLO are unlikely to provide CI-1 or the UCs with the numbers of other criminal associates.  And although law enforcement can request subscriber information by subpoenaing service providers, a telephone number appearing in toll records may not be listed or subscribed in the name or address of the person who is actually using the telephone—and I know from my training and experience that the use of fictitious subscriber information is a common practice of narcotics traffickers.   Narcotics traffickers also commonly use multiple phones and regularly change phone numbers and handsets, all so that law enforcement personnel cannot immediately obtain their identity.

Further, toll records, unlike the interceptions requested herein, do not provide real-time evidence of the content of communications, which are an essential tool not only in providing opportunities to identify the members of the targeted narcotics conspiracy and interdict its activities, but also to be used as evidence of the commission of those activities.  Law enforcement can only expect to identify fully the nature and scope of the targeted activities through the combination of wire surveillance, visual surveillance, and other investigatory tools.

### 7.  Results of Prior Title III Interceptions

The consensual wiretaps placed on the phones belonging CI-1, UC-1, and UC-2 have played an important role in this investigation, and this Court has recently authorized a wiretap on

a phone used by GOMEZ, as discussed above.  These wiretaps alone will not, however, be sufficient to accomplish the goals of the Investigation.  As discussed above. DATELLO appears to be in contact with multiple other members and associates of LCN families, many of whom do not interact with CI-1, and none of whom interact with GOMEZ, UC-1, or UC-2.  Thus because using the existing wiretaps will likely provide information only on criminal activity contemplated by those in communication with GOMEZ, CI-1, UC-1, or UC-2, those wiretaps will not enable law enforcement to identify the full membership of the Luchese Family, its methods of operation, or where it stores the profits of its illegal activities.

As discussed above, many of the Target Subjects, including DATELLO, have previously been target subjects in other Title III wiretaps.  Those wiretaps, for example the 2008 Wiretaps discussed above, have provided useful evidence in other investigations and have demonstrated that wire interception is often the only successful means of penetrating LCN organizations to investigate their illegal activities. The recordings that resulted from those wiretaps will not, however, likely contribute meaningfully to the current investigation.   In addition to simply being many years old, the pre-existing wiretaps did not concern the conspiracy to ship large amounts of cocaine with GOMEZ, and thus will not provide insight into the principal crimes currently under investigation.  Nor can they show how the Luchese Family hierarchy protects and profits from large scale narcotics activity such as the crimes under investigation here, because wiretaps such as the 2008 Wiretaps and the 1981 wiretap of O'CONNOR concerned different crimes or narcotics trafficking on a far smaller scale, as well as (again) being many years old and thus no longer current evidence of the Luchese Family's organization and membership.

### 8. Grand Jury Process

Grand jury processes are not capable of accomplishing the full objectives of this investigation. While certain documents, such as cellphone subscriber records, can and have been obtained through grand jury subpoenas, the grand jury process is unlikely to be useful in developing evidence concerning drug trafficking. Witnesses who could provide additional relevant evidence to a grand jury have not been identified and/or would themselves be participants in the narcotics trafficking activities under investigation. Such individuals would face prosecution themselves; it is unlikely therefore that any of them would testify voluntarily. Nor would it be desirable at this time to seek immunity for such individuals and to compel their testimony, as immunizing them could thwart the public policy that they be held accountable for their crimes. And while the issuance of a grand jury subpoena to any potential witnesses likely would not lead to the discovery of critical information, it would undoubtedly alert both the subpoenaed witness and likely the Target Subjects as well to the pendency of this investigation, which could jeopardize not only the investigation but the safety of UCs and CIs involved in it.

### 9. Search Warrants

Applications for search warrants at physical locations are not feasible or appropriate at this stage of the investigation. Although adequate evidence may exist, or potentially could be developed, to support searches of identified conspirators such as DATELLO and GOMEZ, the anticipated results of those searches would not materially advance the investigation. It is possible that narcotics and related evidence might be recovered, but that would only confirm what law enforcement already knows – that is, that DATELLO and GOMEZ are involved in trafficking significant quantities of narcotics. It is unlikely, at best, that such searches would

2013.07.17

reveal any of the information still sought by law enforcement, such as the full membership and methods of operation of the Luchese Family or the Dominican DTOs, their methods of operation and source of supply, or where they store the profits of their narcotics sales.

Moreover, searches of locations that have been identified would alert the Target Subjects to the presence of the investigation and thereby cause them to destroy evidence or otherwise conceal their narcotics activities from law enforcement. Accordingly, without recourse to the wire surveillance requested herein, the law enforcement agencies involved in this investigation cannot effectively meet the goals of this investigation.

**10. Arrests**

At present, arrests are not a viable means to accomplish the goals of the Investigation. Although probable cause likely exists to arrest both DATELLO and GOMEZ for narcotics trafficking crimes, many of their criminal associates have not yet been identified, and probable cause to arrest those associates who have been identified may not yet exist. Arresting GOMEZ or DATELLO would likely alert those other conspirators to the Investigation, making further investigation difficult if not impossible. Even if GOMEZ or DATELLO then chose to cooperate with law enforcement – and at present, there is no particular reason to believe that either would do so – their co-conspirators could likely destroy evidence or flee before that cooperation was sufficiently developed to allow further arrests. Instead, wire surveillance, in conjunction with other investigatory techniques, will enable law enforcement to learn the identifies of co-conspirators and to develop evidence concerning their criminal activities without alerting them to the existence of the Investigation.

2013.07.17

43

### 11.  Witness Interviews

For many of the same reasons that grand jury process does not appear to be a promising method of investigation in this case, the use of witness interviews does not appear to be a feasible or appropriate at this stage. Witnesses who could provide additional relevant evidence either have not yet been identified or would themselves be participants in the narcotics trafficking activities under investigation. Indeed, because the Target Subjects' meet and operate secretly, and because they are trafficking narcotics at the wholesale level (rather than making street-level retail sales) it is unlikely that persons not involved in the conspiracy will be able provide any material evidence concerning the conspiracy. Further, witnesses are often extremely reluctant to testify against members of a DTO or organized crime Family—or even meet with law enforcement officers to discuss the DTO or organized crime Family's operations—for fear of reprisal from members of the DTO or Family.

### 12.  Trash Searches

Trash searches are also not a reasonable alternative to wire surveillance. To begin with, because GOMEZ, DATELLO, and others are engaged in large but infrequent narcotics transactions, and because they exchange information in person and over the telephone, it is unlikely that their criminal activity produces trash that will provide further information about their criminal activities. In addition, many of GOMEZ's unidentified co-conspirators reside in the Dominican Republic, where the Government does not possess a reliable capability to surreptitiously collect and analyze trash.

### 13.  Parallel and Related Investigations

Although I am aware of related investigations into the Luchese Family by other FBI agents and by other law enforcement agencies, to my knowledge none have access to CI-1 or

GOMEZ, or through them to the Dominican DTOs.   Furthermore, because CI-1's access to DATELLO grants him indirect access to the more senior leaders of the Luchese Family than otherwise available, wire surveillance on DATELLO's phone (the TARGET CELLPHONE) creates unique opportunities to trace the profits from GOMEZ and DATELLO's narcotics trafficking as it makes its way through the Luchese Family hierarchy as tribute.  I am not aware of any civil litigation or other investigations that are likely to aid in accomplishing the objectives of the Investigation.

## IV.  Ancillary Investigative Orders

I respectfully submit the following additional facts and circumstances in support of the Government's Application for certain ancillary investigative orders necessary to effectuate the purposes of the Order of Interception and the needs of this Investigation.

### A.  Order to Service Provider
#### 1.  Technical Assistance to Accomplish the Interception

Consistent with 18 U.S.C. § 2518(4), to effectuate the Order of Interception, the FBI will require the Service Provider for the Target Cellphone, and any Successor Service Provider for the Target Cellphone, to furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with services to the persons whose communications are to be intercepted, and maintain service to the Target Cellphone for the period of interception and any extensions thereto.  Reasonable expenses incurred pursuant to this activity will be processed for payment by the FBI.

#### 2.  Pen Register and Trap and Trace Information

The pen register and trap and trace information sought in the Government's Application (incorporated by reference but for the sake of brevity not repeated herein) is needed to identify

who is calling, and who is being called from, the Target Cellphone. This information is relevant to the investigation in this matter, and indeed is essential to assist in achieving the Objectives of the Interception.

### 3. Geolocation Information and Delayed Notice and Return

Providers of cellular telephone service generally have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service. The most common geolocation information consists of (i) cell-site data, also known as "tower/face information" or cell tower/sector records; and (ii) E-911 Phase II data, also known as GPS data or latitude-longitude data. Cell-site data identifies the cell towers (*i.e.*, antenna towers covering specific geographic areas) that receive a radio signal from the cellular telephone and, in some cases, the sector (*i.e.*, 120° face) of the towers to which the telephone connects. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. In some instances the service provider may send a signal to the cellphone to facilitate or trigger the generation and collection of geolocation information. I respectfully submit that there is probable cause to believe that the geolocation information sought in the Government's Application (incorporated by reference but for the sake of brevity not repeated herein) will assist in achieving the Objectives of the Interception by allowing location of, and as appropriate, the surveillance of, the Target Cellphone and its user, at times relevant to the commission of the Target Offenses. In particular, allowing law enforcement to track DATELLO will assist the FBI when conducting surveillance of DATELLO while meeting other members of the Lucchese family, such as TRUSCELLO and

2013.07.17                                   46

CREA. (Absent a warrant, cell-site data is also available under the pen register provisions of 18 U.S.C. §§ 3121-3126 and the records provisions of 18 U.S.C. §2703(d), with which this application complies *a fortiori*.) No physical installation of a tracking device, as discussed in Fed. R. Crim. P. 41(e)(2)(C), will be required; this information will be provided by means available to the Service Provider. But to the extent this request is otherwise deemed to fall within the confines of that rule, it is further requested, pursuant to 18 U.S.C. § 3103a(b) and Rule 41(f)(3), that the Court authorize delay of notice of the acquisition of the geolocation information until 30 days after execution of the warrant (including extensions or renewals) for geolocation information has commenced, or the date when collection under the warrant (including extensions or renewals) has ended, whichever is later. It is also requested that the return on the warrant for geolocation information under Rule 41(f) be made at the time of, and as part of, the sealing of the information obtained pursuant to the Order of Interception, including any extensions. This delay of notice is justified under those provisions because LCN members and associates, as well as narcotics traffickers very frequently resort to violence among themselves, against suspected cooperators, and occasionally against investigating officers; and further, if narcotics suspects (certain of whom have ties with other countries) learn they are under investigation, they can easily dispose of evidence and contraband, flee, or go under cover to avoid arrest and prosecution. Certainly if DATELLO learns that geolocation information for the Target Cellphone has been provided to law enforcement authorities, he may be expected to take immediate measures to thwart the investigation.

**4. Non-Disclosure**

For the reasons discussed herein, it is necessary that the Service Provider and any Successor Service Provider and their respective agents and employees not disclose or cause the disclosure of the Order to Service Provider to any person other than those of their agents and employees who require said information to accomplish the interception ordered, and that, in particular, the Service Provider and any Successor Service Provider and their respective agents and employees shall in no event make such disclosure to the telephone user involved, or to any actual or potential interceptee.

**5. Successor Service Provider**

As discussed above, because a cellphone user can change the service provider that provides service to a particular cellphone, it is important, to avoid interruption in the execution of the Order of Interception and ancillary orders requested, that the Order to Service Provider be immediately applicable to any Successor Service Provider without the delay attendant upon obtaining a new order of this court. To effectuate the Order of Interception and ancillary orders requested, it is also necessary for the Service Provider and any Successor Service Provider to inform the FBI immediately if the service provider changes during the course of the Interception Period, or if the information needed to change Service provider, *e.g.*, IMEI or telephone numbers for the Target Cellphone are supplied to another service provider.

**B. Order for Expedited Provision of Information Concerning Communications Devices Related to the Interception**

During the course of the interception the pen register and trap and trace devices discussed above will indicate the identifying numbers (*e.g.*, telephone numbers) of telephones and communications devices calling, or being called via, the Target Cellphone. To the extent new

numbers surface during the interception it will be essential to obtain as quickly as possible subscriber and service information for those numbers to permit identification of the users of those numbers and pertinent further investigation. This type of information is available under 18 U.S.C. § 2703(d) pursuant to grand jury subpoena, administrative order, and court order or warrant. However, because some service providers do not process grand jury and administrative subpoenas as quickly as these circumstances require, a court order with a 24-hour time limit is necessary to obtain the subscriber and service information sought in the Government's Application (incorporated by reference but for the sake of brevity not repeated herein) in a timely manner. The court order herein sought, which does not specify a particular telephone number or service provider, will only be used for the duration of this interception for telephone numbers relating to the interception, *i.e.*, numbers calling or being called by the Target Cellphone. Pursuant to 18 U.S.C. § 2705(b), for the same reasons discussed above, it is requested that this order include a direction that the service provider not provide notice to the subscriber or customer as to whom information is provided until such time as the inventory required under 18 U.S.C. § 2518(8)(d) is served.

## V.  Sealing

It is further requested that to avoid premature disclosure of the investigation, guard against flight of suspects or the loss of evidence, and to better ensure the safety of agents and others, this Application, including the Affidavit and accompanying proposed orders, as well as any Periodic Reports, be sealed and filed with the clerk for the Eastern District of New York until ordered unsealed by the Court or by another judge of competent jurisdiction, except that copies of the Order of Interception, Order to Service Provider, and ancillary orders requested

2013.07.17                                49

herein may be provided to the FBI and to the Government, and be served on service providers as may be necessary to effect the order's purpose.

_____
Beth A. Lamanna
Special Agent, FBI

Sworn to before me this

4th ___ day of September 2015

_____
THE HONORABLE MARGO K. BRODIE
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

2013.07.17

50

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of the United States of America for Authorization to Intercept Wire Communications Occurring over the Cellular Telephone Initially Identified as 917-670-2504, USAO Reference No. 2014R01194. | **Order to Service Provider**<br><br>**Sealed** |

## Contents

1. Target Cellphone .................................................................................................. 2

2. Successor Target Cellphones .............................................................................. 2

3. Successor Service Provider ................................................................................. 2

4. Duration of Order ................................................................................................ 2

5. Technical Assistance ........................................................................................... 3

6. Pen Register Trap and Trace Order ..................................................................... 3

7. Pen Register with Cell Site Information .............................................................. 3

8. Additional Geolocation Information .................................................................... 4

9. Non-Disclosure .................................................................................................... 4

10. Sealing ............................................................................................................... 5

**TO:**    **Verizon and its Agents and Employees and any Successor Service Provider as Defined Herein**

This Court having on this date granted an application by the United States for an Order of Interception pursuant to the provisions of Chapter 119 of Title 18, United States Code ("Title III") authorizing Special Agents of the Federal Bureau of Investigation (the "Investigating Agency"), and other investigative and law enforcement officers, assisted, if necessary, by authorized translators, to intercept and record wire communications occurring over the Target Cellphone specified below; and it appearing that Verizon (hereinafter referred to as "Service

Provider") is a provider of electronic communication service within the sense of 18 U.S.C. § 2510(15) and is the service provider for the Target Cellphone;

NOW, THEREFORE, IT IS HEREBY ORDERED:

**1.  Target Cellphone**
This Order applies to the cellular telephone assigned telephone number 917-670-2504 (the "Target Cellphone").

**2.  Successor Target Cellphones**
In addition to the Target Cellphone, this Order shall also apply to any other telephone number subsequently assigned to or used by a cellphone bearing the IMEI 9900042008143000, or any cellphone with a different IMEI but bearing the same telephone number as above ("Successor Target Cellphone"), within the Period of Interception. References below to the Target Cellphone shall include any Successor Target Cellphone.

**3.  Successor Service Provider**
This Order applies to the Service Provider and to any subsequent service provider (Successor Service Provider) who may hereafter provide service to the Target Cellphone or Successor Target Cellphone, upon service of this Order by the Investigating Agency on the Successor Service Provider.

**4.  Duration of Order**
Except as provided in the Pen Register provisions of this Order, this Order shall be in effect for a 30-day period to be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this Court's Order, or ten days from the date of this Court's Order.

2013.07.17                                                     2

### 5.  Technical Assistance

Pursuant to 18 U.S.C. § 2518(4), the Service Provider and any Successor Service Provider shall furnish to the Investigating Agency forthwith all information, facilities, and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that such provider is according the persons whose communications are to be intercepted. The Service Provider shall submit to the Investigating Agency for compensation reasonable expenses incurred in the furnishing of such facilities and technical assistance.

### 6.  Pen Register Trap and Trace Order

Pursuant to 18 U.S.C §§ 3121 *et seq.*, the Service Provider and any Successor Service Provider for the Target Cellphone are directed, for a period of 30 days from the date of this Order, or until termination of the period of interception specified in the Duration of Order above, whichever is longer, to provide to the Investigating Agency all information, facilities and technical assistance necessary for the installation and use of a pen register and trap and trace device on the Target Cellphone, to record and decode dialing, routing, addressing, or signaling information transmitted by the Target Cellphone, and to capture the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication to the Target Cellphone, including all communication-forwarding information, and the date, time and duration of such communications.

### 7.  Pen Register with Cell Site Information

Pursuant to Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. §§ 3121-3126 and 2703(d), the Service Provider and any Successor Service Provider for the Target

Cellphone are directed, for a period of 30 days from the date of this Order, or until termination of the period of interception specified in the Duration of Order above, whichever is longer, to provide to the Investigating Agency all cell site and tower face information available concerning the Target Cellphone and communications made over the Target Cellphone.

### 8. Additional Geolocation Information

Pursuant to Rule 41 of the Federal Rules of Criminal Procedure, the Service Provider and any Successor Service Provider for the Target Cellphone are ordered to provide, during the period of interception specified in the Duration of Order above, all information, facilities and technical assistance needed and available to ascertain the physical location of the Target Cellphone, including but not limited to data indicating the specific latitude and longitude of, or other precise location information concerning, the Target Cellphone, without geographic limit. The technical assistance needed includes initiating a signal to determine the location of the Target Cellphone on the service provider's network or in relation to such other reference points as may be reasonably available, at such intervals and times as directed by the Investigating Agency, unobtrusively and with a minimum of interference to service to the Target Cellphone, and at any time of day or night.

### 9. Non-Disclosure

To avoid prejudice to this criminal investigation, Service Provider, any Successor Service Provider, as well as their agents and employees, shall not disclose or cause the disclosure of this Order, or the interceptions or provision of assistance and facilities that this Order authorizes, to any person, other than its agents and employees who require the information to effectuate the

purposes of this Order, and that, in particular, no disclosure be made to the telephone users involved, or to any actual or potential interceptee.

**10. Sealing**

To avoid premature disclosure of the investigation, guard against flight of suspects or the loss of evidence, and to better ensure the safety of agents and others, this Order to Service Provider is ordered to be sealed and filed with the clerk for the Eastern District of New York until ordered unsealed by the Court or by another judge of competent jurisdiction, except that copies of this Order to Service Provider may be provided to the FBI and to the Government, and be served on service providers as may be necessary to effect the order's purpose.

Dated: Brooklyn, New York

September 4, 2015

THE HONORABLE MARGO K. BRODIE
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

2013.07.17                                                    5

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of the United States of America for Authorization to Intercept Wire Communications Occurring over the Cellular Telephone Initially Identified as 917-670-2504, USAO Reference No. 2014R01194. | **Order of Interception**<br><br>**Sealed** |

# Contents

I. Findings .............................................................................................................. 2

   A. The Target Cellphone ....................................................................................... 2

   B. Use of Target Cellphone for Criminal Purposes ............................................. 2

   C. Types of Communications ............................................................................... 3

   D. Territorial Scope ............................................................................................. 3

   E. Target Subjects and Target Offenses .............................................................. 3

   F. Objectives of the Interception ......................................................................... 4

   G. Normal Investigative Techniques ................................................................... 4

   H. DOJ Authorization .......................................................................................... 4

II. Order of Interception ......................................................................................... 5

   A. Period of Interception ..................................................................................... 5

   B. Territorial Scope and Type of Communications ............................................. 5

   C. Successor Target Cellphones and Successor Service Provider ....................... 6

   D. Minimization ................................................................................................... 6

   E. Periodic Reports .............................................................................................. 6

   F. Inventory ......................................................................................................... 7

III. Ancillary Orders .............................................................................................. 7

   A. Technical Assistance ....................................................................................... 7

   B. Pen Register and Trap and Trace .................................................................... 7

   C. Order for Geolocation Information and Delayed Notice and Return ............... 7

   D. Order for Expedited Provision of Subscriber and Service Information Concerning Communications Devices Related to the Target Cellphone ............................... 8

IV. Sealing .................................................................................................................. 9

**TO:   Special Agents of the Federal Bureau of Investigation and Other Authorized Personnel**

Application under oath having been made before me by Hagan Scotten, an Assistant United States Attorney for the Southern District of New York and an investigative or law enforcement officer in the sense of 18 U.S.C § 2510(7), for an order pursuant to the provisions of Chapter 119 of Title 18, United States Code ("Title III"), authorizing the interception and recording of wire communications, and for certain ancillary investigative orders; and full consideration having been given to the matters set forth in the Application and supporting documents:

## I.  Findings
The Court hereby finds that:

### A.  The Target Cellphone
The Target Cellphone that is the subject of this Order is currently assigned telephone number 917-670-2504. The Target Cellphone is subscribed to in the name of "Lorenzo Gallo, The Safety Group, Ltd., 11 Hannover Sq Ste 15 Fl Wall Street New York 10005-2818." The current Service Provider for the Target Cellphone is Verizon. The current International Mobile Equipment Identifier ("IMEI") for the Target Cellphone is 9900042008143000.

### B.  Use of Target Cellphone for Criminal Purposes
There is probable cause to believe that certain of the Target Subjects, during the Period of Interception herein applied for, will use the Target Cellphone in connection with, to facilitate, to accomplish, and to commit the Target Offenses specified herein, and that such communications will occur on a continuing basis during the Period of Interception herein requested.

2013.07.17                                          2

### C. Types of Communications

There is probable cause to believe that the foregoing use of the Target Cellphone will include voice communications, messages left for and retrieved from voicemail. In addition, there is probable cause to believe that the foregoing use of the Target Cellphone will include relevant background conversations involving persons in the vicinity of the Target Cellphone when the Target Cellphone is active or in use.

### D. Territorial Scope

Pursuant to 18 U.S.C. § 2518(3), interception of communications within the territorial jurisdiction of this court is authorized.

### E. Target Subjects and Target Offenses

There is probable cause to believe that one or more of JOSEPH DATELLO, a/k/a "Big Joe," a/k/a "Joey Glasses;" CARLOS GOMEZ, a/k/a "Go Go;" FRANK SCARPATI; DOMINIC "Dom" TRUSCELLO; RICHARD "Richie" O'CONNOR; LOUIS "Louie" BORELLI; and others unknown (the "Target Subjects"), are involved in the Target Offenses that are the subject of this Application: offenses involving the distribution, and possession with intent to distribute, of controlled substances, to wit, cocaine and heroin, the use of wire facilities to facilitate the same, the maintenance of drug-involved premises, conspiracy to do the same and attempts to do the same, in violation of 21 U.S.C. §§ 841, 843(b), 846, 848, and 856, and Title 46, United States Code, Section 70503; and racketeering and racketeering conspiracy (Racketeer Influenced and Corrupt Organizations "RICO"), in violation of 18 U.S.C. §§ 1962(c) and (d), and punishable under 18 U.S.C. § 1963, by conducting the affairs of an "enterprise," that is, a group of individuals associated in fact, although not a legal entity, to wit: the Target Subjects and others, the activities of which affect interstate and foreign commerce, through a pattern of racketeering

activity consisting of the violations of Title 21, United States Code, Sections 841, 843, 846, 848, and 856 (drug trafficking); and Title 46, United States Code, Section 70503, collectively, the "Target Offenses."

### F. Objectives of the Interception

There is probable cause to believe that the interception hereby authorized will reveal (i) the nature, extent and methods of the Target Subjects' commission of the Target Offenses;(ii) the identities of the Target Subjects, to the extent currently unknown, as well as their accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (iii) the source, receipt, and distribution of contraband and money involved in the commission of the Target Offenses; (iv) the locations and items used in furtherance of those activities; (v) the existence and locations of records; (vi) the locations and sources of resources used to finance the illegal activities; (vii) the locations and disposition of the proceeds from and relating to those activities; and (viii) the location and other information necessary to seize and/or forfeit contraband, money and items of value, and other evidence of or proceeds of the commission of the Target Offenses. In addition, the intercepted communications are expected to constitute admissible evidence of the commission of the Target Offenses.

### G. Normal Investigative Techniques

It has been adequately established that normal investigative techniques have been tried and have failed or reasonably appear unlikely to succeed if tried or to be too dangerous.

### H. DOJ Authorization

Pursuant to 18 U.S.C. § 2516(1), this Application has been authorized by Paul O'Brien, an official of the United States Department of Justice specially designated by the Attorney

General of the United States to authorize applications for the interception of wire or oral communications.

NOW, THEREFORE, IT IS HEREBY ORDERED that:

## II.  Order of Interception

Pursuant to 18 U.S.C. § 2518, Special Agents of the Federal Bureau of Investigation and other investigative and law enforcement officers, as defined in 18 U.S.C. § 2510(7), assisted, if necessary, by authorized translators, are authorized to intercept and to record wire communications of the Target Subjects over the Target Cellphone; and it is further ORDERED that:

### A.  Period of Interception

This Order of Interception shall be executed as soon as practicable after it is signed. Interceptions need not automatically terminate when the first communication described herein has been obtained, but rather may continue until the Objectives of the Interception set forth above are fully achieved, or for a period of thirty (30) days, whichever is earliest. The thirty days is measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this Order of Interception, or ten days from the date of this Order.

### B.  Territorial Scope and Type of Communications

Pursuant to 18 U.S.C. § 2518(3), interception of wire communications that are subject to interception under Title III within the Eastern District of New York is hereby authorized. Interception of messages that are subject to interception under Title III left to or retrieved from voicemail for the Target Cellphone; and interception of background conversations that are subject to interception under Title III occurring in the vicinity of the Target Cellphone while the

telephone is active or otherwise in use, are also hereby authorized, with all intercepted communications to be routed through and first intercepted in the Eastern District of New York.

**C. Successor Target Cellphones and Successor Service Provider**

This Order of Interception applies to any device to which the call number 917-670-2504 might be assigned during the pendency of the Order of Interception, and to any new call number assigned to the device bearing the IMEI 9900042008143000 during the pendency of the Order of Interception (collectively referred to as the "Target Cellphone"). In addition, in the event that the Service Provider changes during the course of the Interception Period, interception may continue with the new service provider under the terms of this Order of Interception and accompanying Order to Service Provider without further order of this court.

**D. Minimization**

Pursuant to 18 U.S.C. § 2518(5), (i) interception shall be conducted in such a way as to minimize the interception of wire communications not otherwise subject to interception under Title III, as set forth in the Government's Application for this Order and the Affidavit submitted in support of the Application; and (ii) in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

**E. Periodic Reports**

Pursuant to 18 U.S.C. § 2518(6), the Government shall provide to the Court a report on or about the tenth and twentieth days (as computed pursuant to Fed. R. Crim. P. 45) following the date of the Order or the date interception begins, whichever is later, showing what progress has

2013.07.17                                              6

been made toward the achievement of the Objectives of the Interception and the need for continued interception.

**F.  Inventory**

Pursuant to 18 U.S.C. § 2518(8)(d), no inventory of the results of the interception for which authorization is now sought need be made before 90 days from the date of the expiration of the Order of Interception or extension thereof, or at such later time as this Court or another judge of competent jurisdiction, upon further application and for good cause shown, may order.

**III.  Ancillary Orders**

**A.  Technical Assistance**

The Government's application for an order pursuant to 18 U.S.C. § 2518(4) directing the Service Provider to provide technical assistance is granted to the extent set forth in the accompanying Order to Service Provider.

**B.  Pen Register and Trap and Trace**

The Government having certified that the information likely to be obtained upon installation and use of the requested pen register and trap and trace is relevant to an ongoing criminal investigation, the Government's application pursuant to 18 U.S.C. §§ 3121 *et seq.* for a Pen Register and Trap and Trace order is granted to the extent set forth in the accompanying Order to Service Provider.

**C.  Order for Geolocation Information and Delayed Notice and Return**

There being probable cause to believe that the information sought will constitute or lead to evidence of the Target Offenses, the Government's application under Fed. R. Crim. P. 41(b) and, to the extent applicable to cell site information, 18 U.S.C. §§3121-3126 and 2703(d), for an order directing the Service Provider to provide geolocation information is granted to the extent set forth in the accompanying Order to Service Provider. Pursuant to 18 U.S.C. § 3103a(b) and

Rule 41(f)(3), because earlier notice may seriously jeopardize the investigation, endanger the life or physical safety of investigating agents or other persons, lead to flight of suspects, loss of evidence, and/or intimidation of witnesses, delay of notice under Rule 41(f) of the acquisition of the geolocation information is hereby authorized until 30 days after execution of the warrant (including extensions or renewals) for geolocation information has commenced, or the date when collection under the warrant (including extensions or renewals) has ended, whichever is later. It is also ~~requested~~ *ordered* that the return on the warrant for geolocation information under Rule 41(f) be made at the time of, and as part of, the sealing of the information obtained pursuant to the Order of Interception, including any extensions.

### D.  Order for Expedited Provision of Subscriber and Service Information Concerning Communications Devices Related to the Target Cellphone

There being reason to believe that the information sought is relevant and material to an ongoing criminal investigation, and that absent such an order the affected service providers may not provide the necessary information sufficiently promptly to effectuate the purposes of the interception herein ordered, the Government's application pursuant to 18 U.S.C. § 2703 for an order for expedited provision of information concerning a telephone or other device in communication with the Target Cellphone is hereby granted, to the extent set forth in the accompanying Order for Expedited Provision of Subscriber and Service Information. The above-referenced Investigating Agency is hereby authorized, during the Period of Interception herein authorized, to serve a copy of that order on any electronic or wire communications service provider that provides service to a telephone or device in communication with the Target Cellphone for information regarding any such telephone or communications device.

**IV.  Sealing**

To avoid premature disclosure of the investigation, guard against flight of suspects or the loss of evidence, and to better ensure the safety of agents and others, this Order, the Application, including the Affidavit and accompanying proposed orders, as well as any Periodic Reports, shall be sealed and filed with the clerk for the Eastern District of New York until ordered unsealed by the Court or by another judge of competent jurisdiction, except that copies of the Order of Interception, Order to Service Provider, and Order for Expedited Provision of § 2703(d)(2) Information may be provided to the Federal Bureau of Investigation and to the Government, and be served on service providers as may be necessary to effect the order's purpose.

Dated: Brooklyn, New York

September 4 , 2015

Time: 11:14 AM.

THE HONORABLE MARGO K. BRODIE
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

2013.07.17                                   9

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| In the Matter of the Application of the United States of America for Authorization to Intercept Wire Communications, USAO Reference No. 2014R01194. | **Order for Expedited Provision of Subscriber and Service Information**<br><br>**Sealed** |

**TO:    Any Provider of Electronic Communications Service Under 18 U.S.C. § 2510(15), and its Agents and Employees**

**1. Issuance of Order of Interception.** This Court has on this date granted an application by the United States for an Order of Interception pursuant to the provisions of Chapter 119 of Title 18, United States Code ("Title III") authorizing Special Agents of the Federal Bureau of Investigation ("Investigating Agency"), and other investigative and law enforcement officers, assisted, if necessary, by authorized translators, to intercept and record wire communications, including messages to voicemail, as well as background conversations occurring over and in the vicinity of the Target Cellphone designated in the Order of Interception for the period of the interception authorized by that order.

**2. Need for Expedition.** To effectuate the purposes of the Order of Interception it is necessary for the Investigating Agency to expeditiously obtain subscriber, toll, and other service information relating to telephones and other devices in communication with the Target Cellphone during the period of interception.

Now, therefore, pursuant to 18 U.S.C. § 2703, it is hereby ORDERED:

**3. Expedited Provision of Information.** Any provider of electronic communication services upon whom this Order is served by the Investigating Agency is directed to provide to the Investigating Agency, within twenty-four hours of request by the Investigating Agency, all published and non-published subscriber information, including telephone or instrument number or other subscriber number or identity and any temporarily assigned network address; means and source of payment for such service (including any credit card or bank account number); and local and long distance call and call duration records for up to a 30-day period immediately preceding the Investigating Agency's request, for any telephone or communications device that Investigating Agency represents to the service provider is in pertinent communication with the Target Cellphone or is otherwise related to the interception authorized by this Court.

**4. Duration of Order.** This Order shall be in effect for a 30-day period to be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this Court's Order, or ten days from the date of this Court's Order.

**5. Non-Disclosure.** Pursuant to 18 U.S.C. §2705(b), because earlier notice may seriously jeopardize the investigation, endanger the life or physical safety of investigating agents or other persons, lead to flight of suspects, loss of evidence, and/or intimidation of witnesses, no service provider upon whom this order is served shall provide notice to any subscriber or customer as to whom information is provided (i) for six months following the date of this order, (ii) and

thereafter, without ten (10) days prior notice to the Investigating Agency in case a further delay

in providing notice is warranted.

Dated: Brooklyn, New York

_September 4_, 2015

THE HONORABLE MARGO K. BRODIE
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

2013.06.07                                         3